**MOBIL OIL CORPORATION, Plaintiff,**

v.

**AMOCO CHEMICALS CORPORATION, Defendant.**

**Civil A. No. 83–207 LON.**

United States District Court, D. Delaware.

Sept. 29, 1994.

Order Amending Decision June 29, 1995.

**1336**

Charles S. Crompton, Jr., of Potter Anderson & Corroon, Wilmington, Delaware; of counsel: John A. Diaz, William S. Feiler, Jamaes W. Gould and Harry C. Marcus, of Morgan & Finnegan, New York City, Alexander J. McKillop, of Mobil Oil Corporation, Fairfax, Virginia; for Plaintiff.

Richard K. Herrmann, of Bayard, Handelman & Murdoch, P.A., Wilmington, Delaware; of counsel: William R. Jentes, Russell E. Levine, James M. Amend, Mark A. Pals, and David K. Callahan, of Kirkland & Ellis, Chicago, Illinois; Joseph H. Ballway, Jr., of Amoco Corporation, Chicago, Illinois, for Defendant.

LONGOBARDI, Chief Judge.

## I. NATURE AND STAGE OF THE PROCEEDINGS

This is the opinion relative to the damages phase of an action for patent infringement originally filed by Plaintiff Mobil Oil Corporation ("Mobil") against Defendant Amoco Chemical Company ("Amoco"). Docket Item ("D.I.") 1. At a trial on the issues of infringement, willful infringement, validity and enforceability of Mobil's U.S. Patent Nos. 3,702,886 ("the '886 patent"); Re. 29,857 ("the '857 patent"); 3,856,872 ("the '872 patent"); and 4,049,573 ("the '573 patent"), D.I. 240 at I–3, ¶ 7, the Court found that Mobil's patents were not invalid. The Court also found that Amoco did not infringe any claims of the '573 patent, Amoco literally infringed claim 6 of the '872 patent[1] and Amoco infringed claims 1 and 3 of the '886 patent[2] under the doctrine of equivalents and claims 1 and 2 of the '857 patent[3] under the doctrine of equivalents. D.I. 151; see Mobil Oil Corp. v. Amoco Chemicals Corp., 779 F.Supp. 1429 (D.Del.1991), aff'd, 980 F.2d 742 (Fed.Cir.1992) (per curiam). The Court further found that: (1) Amoco had not willfully infringed the '886, '872 or '857 patents; (2) the case was not an exceptional one; and (3) Mobil's remedies, including damages, would be considered in a subsequent phase of litigation. D.I. 151.

In an eleven-day trial, the Court heard testimony from twelve witnesses who appeared live and one witness who appeared by videotape and received designated deposition testimony from at least thirty other witnesses. The damages trial transcript exceeds twenty-seven hundred pages and the exhibits admitted into evidence number more than sixteen hundred. It is upon this record that the Court bases its decision.

---

1. Mobil's '872 patent claims a xylene isomerization process which uses ZSM–5 catalysts.

2. Mobil's '886 patent is a composition patent directed toward the ZSM–5 family of zeolites.

3. Mobil's '857 patent relates to the catalytic conversion of hydrocarbons through use of the ZSM–5 zeolites.

## II. STATEMENT OF JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2201. Venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

## III. BACKGROUND AND FACTS

For a detailed discussion of the technology and the facts surrounding Amoco's infringement, see this Court's liability opinion, *Mobil Oil Corp. v. Amoco Chemicals Corp.,* 779 F.Supp. 1429 (D.Del.1991), *aff'd,* 980 F.2d 742 (Fed.Cir.1992) (per curiam).

### A. MOBIL'S INFRINGED PATENTS

Amoco infringed three of Mobil's patents, two of which, the '857 and '872 patents, cover a xylene isomerization process and are referred to as the "process patents." The third patent, the '886 patent, covers the composition of ZSM–5 catalyst and is referred to as the "composition of matter" or "composition" patent. The '857 patent expired on February 5, 1991; the '872 patent expired on December 24, 1991; and the '886 patent expired on November 14, 1989. D.I. 240 at Exhibit J–2; *see also* Defendant's Exhibit ("DX") 1903; DX 1904; DX 1905.

### B. AMOCO'S PARAXYLENE OPERATIONS

Amoco manufactured paraxylene ("PX") at four separate facilities: two located in Decatur, Alabama (the Decatur No. 1 and No. 2 units); and two located in Texas City, Texas (the Texas City No. 1 and No. 2 plants). Ely Transcript ("Tr.") 2564. The Texas City PX units used an extracted feedstock from Amoco's Texas City refinery. D.I. 240 at Exhibit J–2, ¶ 9. The Decatur PX units used an unextracted feedstock which contains certain non-aromatic or saturate impurities. Ely Tr. 2568–69.

The Texas City No. 1 plant began operating in 1967 and is still in operation. D.I. 240 at Exhibit J–2; *see also* Ely Tr. 2564–65. It used the Octafining catalyst from 1967 to 1973, at which time, it switched to Amocofining. D.I. 240 at Exhibit J–2, ¶ 11. In 1976, Amoco installed Mobil's MVPI catalyst at Texas City No. 1 and, in 1983 Amoco, re-

placed MVPI with its AMSAC catalyst. Ely Tr. 2580–84; Plaintiff's Exhibit ("PX") 2354; DX 1929; D.I. 240 at Exhibit I. The Texas City No. 2 plant began operating in 1967 or 1968 with Octafining but switched to Amocofining in 1975. Ely Tr. 2565; D.I. 240 at Exhibit J–2, ¶ 13. Amoco replaced Amocofining with MVPI at Texas City No. 2 in 1977 and replaced MVPI with AMSAC in 1984. PX 2354; DX 1929; D.I. 240 at Exhibit I.

The Decatur No. 1 plant began operating in 1968 and was closed in 1979 because its PX capacity was not needed by Amoco. Ely Tr. 2564–66. Amoco installed the Octafining catalyst at Decatur No. 1 in 1968 and replaced Octafining with Amocofining in 1974 which was used until the unit was closed. DX 1929. The Decatur No. 2 plant began operating in 1978 and is still in operation. Ely Tr. 2566. Although the Decatur No. 2 unit was designed to use the Amocofining catalyst, it began its operations with Mobil's MVPI. Amoco replaced MVPI with its AMSAC catalyst in 1980. Ely Tr. 2567–68; PX 2354; DX 1929.

The Texas City Nos. 1 and 2 and the Decatur No. 2 units produced approximately 18.59 billion pounds of PX using AMSAC catalysts during the period of infringement. PX 2354; D.I. 240 at Exhibit I.

### C. MOBIL'S LICENSING OF THE VPI TECHNOLOGY

In 1973, Mobil first utilized a ZSM–5 catalyst to produce PX in its plant in Naples, Italy. D.I. 1544; Penick Tr. at 838. Mobil calculated the benefits of its new MVPI process and catalyst to be between 0.6–1.0 cents per pound of PX produced. DX 1288. Due to the commercial success of the VPI technology at Naples and Mobil's relatively small xylenes operation worldwide, DX 1374.1 (less than 3%), Mobil decided to license the VPI process and lease its MVPI catalyst. DX 1544; Penick at 839. Mobil began the licensing and leasing of its MVPI technology in 1975. DX 1544; Penick Tr. 839. Although it debated about selling the catalyst, Mobil chose to lease the catalyst for two primary reasons: (1) it enabled Mobil to maximize its income; and (2) Mobil would retain title of the catalyst and "thus could control its use

and disposition." DX 1544; Penick Tr. 840. Mobil fixed its lease rates to be cost-neutral with the prior technology catalyst used in xylene isomerization. Green Tr. 2365–66, 2369; DX 1544. Under Mobil's standard MVPI catalyst lease, the licensee was to pay Mobil: $3.00 per pound of catalyst on delivery; $3.125 per pound quarterly for the first two years; $2.75 per pound quarterly for the third year; and $2.50 per pound quarterly after three years. *See, e.g.,* DX 1290.

Initially, Mobil decided it would accept 25% of the low end of the 0.6–1.0 cents per pound benefits, or 0.15 cents per pound of PX produced, as a royalty on its process patents. DX 1288. After negotiations, however, Mobil established its final VPI process license rates at: 0.25 cents per pound for the first 200 million pounds of PX produced each year; 0.20 cents per pound for the next 300 million pounds; and 0.15 cents per pound for any PX produced beyond 500 million pounds. DX 1288; *see, e.g.,* DX 1357.

Beginning in 1975, Mobil offered its standard VPI process license and MVPI catalyst lease rates to PX manufacturers. D.I. 273 at 5, ¶ B1.9. Mobil licensed its MVPI technology at the above standard rates to eleven licensees/lessees (including Amoco) by April of 1980. Specifically, Mobil entered into VPI process licenses and MVPI catalyst lease agreements with: Tenneco Oil Company ("Tenneco") in December of 1975, DX 1884–85; Sun Petroleum Products Company ("Sun") in June of 1976, DX 1888–89; Hercules Incorporated ("Hercules") in June of 1976, DX 1890–91; Montedison S.p.A. ("Montedison") in July of 1976, DX 1886–87; Teijin Petrochemical Industries Limited ("Teijin") in August of 1976, DX 1892–93; Exxon Chemical Company U.S.A. ("Exxon") in August of 1976, DX 1896–97; Amoco in October of 1976 and January of 1978, DX 1290, 1296 and 1308; Essochem Benelux B.V. ("Essochem"), an Exxon affiliate, in November of 1976, DX 1898; Tonen Sekiyukagaku K.K. ("Tonen"), an Exxon affiliate, in January of 1977, DX 1899; St. Croix Petrochemical Corporation ("St. Croix"), a Hercules af-

filiate, in September of 1977, DX 1900; and Idemitsu Petrochemical Company, Limited ("Idemitsu") in April of 1980, DX 1901–02. By 1980, Mobil's MVPI technology was utilized in fourteen xylene isomerization units worldwide. DX 1236; DX 1950; D.I. 240 at J–2, ¶ 34.

Even Mobil's own witnesses and documents referred to the MVPI license and lease rates as "standard", "established", "uniform", "fixed" and "the same." *See, e.g.,* Penick Tr. 683, 739, 800; Huggett Tr. 1720–21, 1734; Green Tr. 2370; DX 1342; DX 1357; DX 1358; DX 1505; DX 1508; DX 1676; DX 1300–R. Further, once Mobil had set its rates, it did not change them. All of Mobil's licenses and leases entered into within the period from December of 1975 to April of 1980 were at Mobil's standard rates. Moreover, from 1975 until 1988, Mobil continued to offer the same MVPI license and lease rates listed above to its prospective licensees. Specifically, Mobil offered MVPI licenses and leases at its standard rates to the following companies: Indian Petrochemicals in April or May of 1980, Penick Tr. 737, 872; Phillips Petroleum in July of 1981, DX 1306; DX 1959; Mitsubishi Chemical Industries, Ltd. in October of 1977, DX 1360; Penick Tr. 863; Shell Internationale Research ("Shell") in August of 1988, DX 1537; Chevron Research Company in May of 1977, DX 1305; Chinese Petroleum, Tr. 2505 (stipulation); Kohap (a Korean company), *id.;* Veba–Chemie, *id.;* and BP California, *id..* For various reasons none of the companies listed above accepted Mobil's standard MVPI license and lease arrangement. *Id.*

These numerous rejections led the Court to the conclusion that Mobil's standard rates were indeed about all the market could bear.[4] Professor Myers supported this conclusion by analogizing the rejections of Mobil's VPI technology to a car dealer who was not moving his inventory:

> Now, in that situation, you as the car dealer would not start raising your prices,

---

4. Mobil asserts that it did not change its rates because it signed up all but one of its licensees within an eleven month period and then could not raise the rates for the few remaining strag-

glers. D.I. 273 at 5. For reasons discussed *infra,* the Court does not accept Mobil's "stragglers" argument.

and you would certainly not conclude from the evidence [of the rejections] in front of you that the price ought to be held a lot higher than it actually is, even though you can't tell for sure the reasons why your customers turned you down.

Myers Tr. 1825. Common sense also supports this conclusion.

The Court's conclusion that Mobil's standard rates were all the market could bear is further supported by the fact that Mobil was forced to give concessions to its existing MVPI licensees in order to keep them on board. Penick Tr. 880. Although he preferred to call them "accommodations", Mr. Fagan[5] acknowledged that one way Mobil maximized its licensing revenue was to offer accommodations "to licensees in order to keep them within the fold." Fagan Tr. 2501. For example, Mobil gave concessions to: Exxon in February of 1978 (MVPI), DX 1491; DX 1421; Chevron in October of 1979 (MLPI), DX 1970; Idemitsu in May of 1981 (MHTI), DX 1610; DX 1599; Teijin in January of 1982 (DEIP), DX 1528; Arco in May of 1983 (MLPI), DX 1970; Teijin in January of 1984 (BDEIP); and St. Croix in January of 1988 (MVPI), DX 1586. D.I. 276 at Exhibit A (Mobil's timeline); DX 1970.[6] These concessions were quantified by Amoco's expert witness, Mr. Sims. *See* DX 1801-Q. In fact, Mobil's own licensing expert, Mr. Evans, testified that he was unaware of *any* instance when a Mobil xylene isomerization licensee asked Mobil for a concession and was not given one. Evans Tr. 1146. Professor Myers viewed the concessions as further

evidence that the standard rates captured all of the value that the market was willing to pay for Mobil's MVPI technology. Myers Tr. 1826.

Furthermore, Mr. Penick stated that when the standard license and lease rates were set they were all the market would bear. Penick Tr. 800–03. Mr. Penick also testified that his impression that the MVPI rates were all the market would bear continued until he left Mobil in 1985. Penick Tr. 802–03. Mr. Penick's testimony is supported by Mr. Fagan who testified that, in October of 1980, he was "convinced he was making as much money as could be made" and that Mobil was lucky that its annual revenues for the MVPI licensing program were as high as they were. Fagan Tr. 2475–76; DX 1362.

As stated above, Mobil licensed its VPI technology to Amoco at its standard rates in October of 1976. Although neither party expressly terminated the license agreement, this Court held that Amoco was in default of the licensing agreement because it stopped making the necessary royalty payments to Mobil. *Mobil,* 779 F.Supp. at 1501.

Despite its policy against permitting others to experiment with ZSM–5, in 1979, Mobil began to make ZSM–5 samples available to non-Mobil parties. DX 1365; Penick Tr. 906–911; *see also* discussion of *Georgia–Pacific* Factor 4, *infra* Section F. In addition, although Mobil never licensed the right to make ZSM–5 catalyst for use in xylene isomerization, it did license the right to make

5. From 1974 to 1977, Charles A. Huggett, Esquire was "in charge of licensing for Mobil as manager of patents and licensing." Huggett Tr. 1669. Mobil's Technical, Sales and Licensing Department (TS & L) was created in January, 1977, by Joe E. Penick, Mobil's Senior Vice President in charge of research and engineering and President of Mobil's Research and Development Corporation. Penick Tr. 665–67; DX 1943. Mr. Penick developed the licensing policy of TS & L and had the ultimate responsibility for setting Mobil's license and lease rates from January, 1977 through November 1985. Penick Tr. 667–68. Frank N. Fagan, Jr. was Vice President of TS & L from 1977 to 1987. Fagan Tr. 2445. He was hired by Mr. Penick to "head-up" or be "in charge" of TS & L. Penick Tr. 667. Thus, Mr. Fagan was the "one who made the decisions" with respect to the administration of Mobil's licensing business. Fagan Tr. 2452–53. Mr.

Penick instructed Mr. Fagan to generate as much revenue as he could from the marketplace on a long term basis for Mobil's licensing business. Penick Tr. 789; Fagan Tr. 2453–54. Mr. Fagan was succeeded by John R. Green in 1987. Green Tr. 2365; DX 1943.

6. While Mobil has an argument for why each concession is irrelevant to the present case, D.I. 273 at 7–9, the Court is not (for the most part) as concerned with the terms of each of Mobil's concessions as much as the Court is concerned with the fact that Mobil made numerous and substantial concessions to its licensees in order to keep their business. These concessions show that Mobil was willing to renegotiate its standard rates downward in order to keep a valued customer.

ZSM–5 for other uses. In particular, Mobil licensed Universal Oil Products ("UOP") to make ZSM–5 in December of 1992; Chevron in July of 1983; W.R. Grace in January of 1985; and Union Carbide (in settlement of litigation) in December of 1985. D.X 1970; Penick Tr. 752–757.

## IV. ISSUES PRESENTED AT TRIAL

The two principal issues before the Court in the damages phase of this case are: (1) the amount of damages adequate to compensate Mobil for Amoco's infringement of the three patents at issue; and (2) the rate at which prejudgment interest is to be calculated.

## V. DISCUSSION

### A. DAMAGES STANDARD

■ In determining the appropriate amount of damages to award Mobil, the Court is bound by 35 U.S.C. § 284 which provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Necessarily, Mobil, as the claimant, bears the burden of proof on the issue of damages. *See, e.g., BIC Leisure Products, Inc. v. Windsurfing International, Inc.,* 1 F.3d 1214, 1217 (Fed.Cir.1993); *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988).

■ The appropriate measure of compensatory damages may be determined by one of three methods: (1) lost profits; (2) an established royalty; or (3) a reasonable royalty. Chisum, 5 *Patents* § 20.03 at 20–77. A determination of lost profits or an established royalty are methods of assessing the actual damages suffered by the patentee. *Trell v. Marlee Elec. Corp.,* 912 F.2d 1443, 1445 (Fed. Cir.1990); *Del Mar Avionics, Inc. v. Quinton Inst. Co.,* 836 F.2d 1320, 1328 (Fed.Cir.1987) ("[I]t is reasonable to assume that [an established] royalty is a fair measure of the *actual* damage to a patentee who has authorized others to practice the patented invention.")

(emphasis added). A reasonable royalty, on the other hand, is a measure of recovery "intended to provide a just recovery to persons who for evidentiary or other reasons cannot prove lost profits or an established royalty." *Hayhurst v. Rosen,* 1992 WL 123178 (E.D.N.Y.1992); Chisum, 5 *Patents* § 20.02[3] at 20–159.

Mobil asserts that neither lost profits nor an established royalty are the correct measure of damages. Rather, Mobil contends that the Court must conduct a hypothetical negotiation between the parties at the time the infringement began to determine what would constitute a "reasonable" royalty in this case. Mobil claims that a reasonable royalty would amount to 50% of Amoco's anticipated economic benefits from its infringement.

Needless to say, Amoco disagrees. Instead, Amoco argues that Mobil had an established royalty which should be used to determine Mobil's damages. Amoco contends that Mobil had instituted standard, established rates for its MVPI process license and catalyst lease by offering and/or granting MVPI process licenses and catalyst leases at the same rate to virtually the entire PX industry.

### B. FRAMEWORK FOR ANALYSIS: SEPARATING THE PATENTS

Mobil argues that Amoco infringed a unique "package" of rights which it has never licensed before including: (1) the right to make or have made and use infringing catalysts under the '886 patent; (2) the right to use infringing catalysts for xylene isomerization under the '857 patent; and (3) the right to use infringing catalysts to practice xylene isomerization under the '872 patent. D.I. 273 at 2, ¶ B1.1; DX 2747.

In trying to determine the appropriate amount of damages to compensate Mobil for Amoco's infringement, the Court found it necessary to separate the bundle of rights infringed by Amoco into two parts: (1) process patent rights; and (2) composition of matter patent rights. The Court came to this conclusion because it was unable to perform a single analysis with respect to all of

the patent rights infringed. *See Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1561 n. 8 (Fed.Cir.1983) ("it may well be necessary to determine damages separately for each ... patent").

For the reasons stated in Section C, *infra,* the Court finds that Mobil had an established rate with respect to the process patents at issue and that the established rate is reasonable. The Court, however, was not able to find an established rate for the composition of matter patent rights. *See infra* Section E1. Because of the overwhelming evidence supporting an established rate with respect to the process patents, the Court felt unjustified in performing a *Georgia–Pacific* hypothetical negotiation analysis with respect to these rights.[7] This is especially true in light of the high degree of artificiality involved in such an analysis. *Fromson,* 853 F.2d at 1574 ("Determining a fair and reasonable royalty is often ... a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge."); *American Medical Systems, Inc. v. Medical Engineering Corp.,* 794 F.Supp. 1370, 1394 n. 15 (E.D.Wis. 1992) ("Determining a reasonable royalty from a hypothetical negotiation is not easy; the process is truly artificial."), *aff'd in part, rev'd in part,* 6 F.3d 1523 (Fed.Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994).

While the Court is mindful of the testimony of Mr. Evans, a licensing expert for Mobil who seemed to say that the process rights and composition rights should be viewed as a "package" and, as such, would not be split up for separate negotiations in the real world, Evans Tr. 1034–37, the Court felt it had no meaningful choice other than to split up the rights involved and analyze them separately.

■ Moreover, the Court's separation of the process patents from the composition of matter patent simplifies one of the issues in this case. Mobil asserts that it is entitled to recover for all of the rights infringed by Amoco until the last of the three patents expires. Because the composition of matter patent expired first on November 14, 1989 and the two process patents did not expire until February 5, 1991 ('857 patent) and December 24, 1991 ('872 patent), D.I. 240 at Exhibit J–2, ¶¶ 1–3, Mobil is requesting a recovery for its catalyst rights under the composition patent beyond the period of Amoco's infringement of those rights. If the Court were to follow the analysis suggested by Mobil and find one number which would encompass all of the rights infringed by Amoco, such an approach could arguably be found to make sense. *See Brulotte v. Thys Co.,* 379 U.S. 29, 33–34, 85 S.Ct. 176, 179–180, 13 L.Ed.2d 99 (1964). However, this ignores the reality that Mobil itself created when it divided its rights under the process patents from its rights under the composition of matter patent by separately licensing and leasing them. In fact, after Mobil's composition of matter patent expired, others began making and selling ZSM–5 catalyst. Green, quoted at Smith Tr. 1398. In light of Mobil's own separate treatment of the process patents and the composition of matter patent and because the Court has separated the rights infringed by Amoco in order to better fix an award of damages, the Court finds it entirely inappropriate and "unlawful *per se* " to extend the scope of Mobil's composition of matter patent beyond its expiration date. *Id.* at 32, 85 S.Ct. at 179; *Zenith Radio Corp. v. Hazeltine,* 395 U.S. 100, 136–137, 89 S.Ct. 1562, 1583–1584, 23 L.Ed.2d 129 (1969); *Sanford Redmond Inc. v. Mid–America Dairymen, Inc.,* 29 U.S.P.Q.2d 1222, 1226, 1992 WL 57090 (S.D.N.Y.1992) ("The use of the patent, therefore, to obtain an agreement for payment of compensation beyond the expiration of the patent renders the agreement unlawful *per se.*"), *aff'd,* 993 F.2d 1534 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 310, 126 L.Ed.2d 258 (1993). Thus, the period for damages with respect to the catalyst rights infringed under the '886 patent extends from May of 1980 to November 14, 1989.

---

**7.** In any event, were the Court to go back in time to 1980 and try to determine what royalty rate the parties would have agreed upon for the MVPI process patents, the Court would have found the result of the hypothetical negotiation to be Mobil's established license rates. *See infra* Section F.

## C. *MOBIL HAD AN ESTABLISHED ROYALTY RATE FOR ITS VPI PROCESS PATENTS*

### 1. *THE LAW: ESTABLISHED ROYALTY AS REASONABLE ROYALTY*

Keeping in mind that section 284 commands that damages should be no less than a reasonable royalty, the Court notes that the Federal Circuit has held that a reasonable royalty "may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed.Cir.1983); *see also Rude v. Westcott*, 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1889) ("It is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use and sell his patents, as to establish a regular price for a license, that price may be taken as the measure of damages against infringers."); *BIC Leisure Products*, 1 F.3d at 1219 (In holding that district court erred by applying lost profit analysis instead of lost royalty analysis, Federal Circuit noted that: "Windsurfing itself set the value of its patent rights by licensing its technology to nearly every company supplying sailboards in the United States without competing itself in most sailboard markets."); *Studiengesellschaft Kohle m.b.H. v. Dart Indus., Inc.*, 666 F.Supp. 674, 680 n. 6 (D.Del.1987) ("An established royalty rate is used in a case in which prior negotiated royalties to the time of infringement are paid by sufficient persons to indicate the reasonableness of the rate, are uniform, are not paid under threat of litigation, and are for comparable rights under the patent."), *aff'd*, 862 F.2d 1564 (Fed.Cir.1988).

■ Moreover, if an established royalty is shown to exist, such a royalty is generally deemed the best measure of damages for infringement. *Hanson*, 718 F.2d at 1078 (" 'Where an established royalty rate for the patented inventions is shown to exist, the rate will usually be adopted as the best measure of reasonable and entire compensation.' "), (quoting *Tektronix, Inc. v. United States*, 552 F.2d 343, 347 (Ct.Cl.1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978)); *see also Clark v. Wooster*, 119 U.S. 322, 326, 7 S.Ct. 217, 218–19, 30 L.Ed. 392 (1886) ("It is a general rule in patent causes that established license fees are the best measure of damages that can be used."); *Trell*, 912 F.2d at 1445–46 (Federal Circuit expressed preference for established royalty; where none exists, then courts must use hypothetical negotiation analysis); *Fromson*, 853 F.2d at 1574 ("Lacking adequate evidence of an established royalty, the court was left with the judge-created methodology described as 'hypothetical negotiations between willing licensor and willing licensee.' "); *Nickson Indus. v. Rol Mfg.*, 847 F.2d 795, 798 (Fed.Cir.) ("Where an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty."), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1988).

■ In order for a patentee's negotiated royalties to constitute an "established" royalty they must meet five criteria: (1) they must be paid or secured before the infringement began; (2) they must be paid by a sufficient number of persons to indicate the reasonableness of the rate; (3) they must be uniform in amount; (4) they must not have been paid under threat of suit or in settlement of litigation; and (5) they must be for comparable rights or activity under the patent. *Studiengesellschaft*, 666 F.Supp. at 680 n. 6; *see also Trell*, 912 F.2d at 1446–47 (Fed.Cir.1990) (to be "established", royalty must be paid by sufficient number of persons to indicate general acquiescence in its reasonableness and must be for "commensurate" use of patent); Chisum, 5 *Patents* § 20.03[2][b]. Because of these stringent criteria, few courts have actually found an established royalty. *See, e.g., Julien v. Gomez & Andre Tractor Repairs, Inc.*, 512 F.Supp. 955 (M.D.La.1981).

While the Third Circuit seemed to indulge a presumption that an established royalty, if proven, is the proper measure of damages, *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 1358–60 (3d Cir.), *cert. denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980), other courts have been less clear about their treatment of an estab-

lished royalty. Almost all courts recognize, however, that an established royalty may be too low to be "reasonable" under certain circumstances. *See, e.g.*, Chisum, 5 *Patents* § 20.03[2][d]. For example, courts have stated that established rates which are artificially depressed because the patent had not yet gained public recognition or acceptance or due to widespread infringement or to avoid challenges to the patent, may not constitute a reasonable royalty. *See id.; Nickson*, 847 F.2d at 798; *Trio Process*, 612 F.2d at 1359.

A noted treatise on patent law summarizes the law pertaining to the "established royalty" rule as follows:

> A patent owner may recover as a measure of damages the royalty rate established by prior actual licenses for acts comparable to those engaged in by the infringer without authority. An established royalty rate is a uniform one freely negotiated and paid by a sufficient number of licensees. Rates agreed to under threat of suit or in settlement of litigation are not conclusive.

> While existence of an established royalty usually sets the *minimum* recovery by a patent owner for infringement, it does not necessarily set the *maximum* recovery. Such an established royalty does not preclude the patent owner from recovering a greater sum under a reasonable royalty theory where the established rate was unfairly depressed because the patent had not yet gained recognition or because of widespread infringing activity.

Chisum, 5 *Patents* § 20.03[2] at 20–145 (emphasis in original). Another noted authority on patent law has agreed that "[w]here an established royalty exists, it will usually be the best measure of what is a reasonable royalty. Nonetheless, a reasonable royalty may be greater than an established royalty.... But the patentee must come forward with evidence that an established royalty rate makes the award inadequate." Robert L. Harmon, *Patents and the Federal Circuit*, § 12.2(c) at 423 (2d ed. 1991) (footnote omitted).

## 2. APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

■ Mobil had an established royalty rate for its VPI process patents at issue in the present case. In fact, the Court thinks that there could be no clearer case for the existence of an established royalty rate. The Court will address each of the five criteria for an established rate in turn.

### a. MOBIL'S RATES WERE PAID OR SECURED BEFORE AMOCO'S INFRINGEMENT BEGAN

As set forth above, Mobil had established "standard" rates for its MVPI process in 1975. By the time Amoco's infringement began in May of 1980, D.I. 240 at Exhibit J–2, Mobil had licensed eleven companies under those same established rates. Thus, it is clear that Mobil's established rates were paid before Amoco's infringement began.

### b. MOBIL'S RATES WERE PAID BY A SUFFICIENT NUMBER OF LICENSEES, TO INDICATE THE REASONABLENESS OF THE RATES

As already stated, Mobil's standard MVPI license and lease rates were paid by eleven chemical companies including large companies like Sun, Hercules and Exxon (as well as Amoco). In light of the size and sophistication of these companies and Mobil's statements and admissions that it believed its standard rates to be reasonable, *see, e.g.*, DX 1300–R; Huggett Tr. 1724, the Court finds that the rates were paid by a sufficient number of licensees to indicate the reasonableness of the rates.

### c. MOBIL'S RATES WERE UNIFORM

As already explained, Mobil's standard MVPI license rates were uniform with regard to each of its eleven licensees and lessees. Under Schedule A of Mobil's standard VPI process license, the licensee was to pay Mobil: 0.25 cents per pound for the first 200 million pounds of PX produced each year; 0.20 cents per pound for the next 300 million pounds; and 0.15 cents per pound for any PX produced beyond 500 million pounds. All of the eleven MVPI licensees signed license agreements incorporating Mobil's standard

rates. Moreover, Mobil even continued to offer its MVPI process license at the same standard rates until at least 1988. While evidence was introduced to show that Mobil had later accommodated some of its licensees with rate reductions or other concessions, no evidence whatsoever was produced to show that anyone had ever paid or been offered a similar MVPI process license for rates higher than Mobil's standard rates. Accordingly, the Court finds that Mobil's standard rates were uniform.

### d. *MOBIL'S RATES WERE NOT PAID UNDER THREAT OF SUIT OR IN SETTLEMENT OF LITIGATION*

Mobil has not produced any evidence that its standard MVPI process license rates were paid under threat of suit or in settlement of litigation. Friedlander Tr. 2230; Evans Tr. 1204. In fact, one of Mobil's former employees, Mr. Huggett, admitted that there was no pending litigation involving the patents covering the MVPI process and catalyst when Mobil set its standard licensing (and lease) rates. Huggett Tr. 1779–80. Mr. Huggett further stated that when Mobil began its licensing of the MVPI process and catalyst patents it assumed that those patents were valid. *Id.*

### e. *MOBIL'S RATES WERE FOR COMPARABLE RIGHTS UNDER THE PATENTS*

Mobil's standard MVPI process license granted patent rights comparable to those infringed by Amoco. Mobil argues that the patent rights infringed by Amoco in this case are not comparable to the rights which were licensed under its standard MVPI license. Specifically, Mobil argues that because it had not licensed anyone to use an infringing catalyst in the MVPI process, Amoco's use of its AMSAC catalysts in the MVPI process is not comparable to the rights granted under its standard license.[8]

The Court, however, disagrees with Mobil on this issue. It is common knowledge that the word "comparable" means "similar" rather than "exactly the same." The rights needed by Amoco to use its AMSAC catalyst in the VPI process are similar to the rights granted to the VPI licensees. The standard VPI process license granted the licensee a world-wide, non-exclusive license under all of Mobil's patents covering the VPI process (but expressly excluding catalyst compositions and methods of catalyst manufacture) to practice the VPI process in any VPI unit. *See, e.g.,* DX 1296.

The rights infringed by Amoco were similar or "comparable" to the rights granted under the standard license. Specifically, Amoco practiced the VPI process under two of Mobil's patents. The fact that Amoco did so with an infringing catalyst does not affect the comparability of the rights at issue. The focus of the license is on the right to use the VPI process not on the catalyst that is used. This is confirmed by Mr. Green's testimony in the liability trial that it would be unnecessary to "renegotiate" the licenses under the process patents:

> [I]f someone were practicing the MVPI process technology under license to Mobil and switched to using their own ZSM–5 catalyst—okay—and continued to pay us process royalties under the MVPI process license, we would not sue them over the MVPI process license, but we most certainly would file suit about infringing our '886 patent.

Green Liability Tr. 894. Moreover, the standard license specifies that the licensee is not required to obtain VPI catalyst from Mobil. *Id.* at § 3.3. As Mobil successfully argued at the liability trial, section 3.3 was inserted to avoid an illegal tie-in between the process license and the lease of catalyst. *Mobil,* 779 F.Supp. at 1499–1500.

---

8. Mobil also contends that it had never before licensed the right to make ZSM–5 catalyst for use in xylene isomerization, a right which Amoco infringed by making AMSAC, a ZSM–5 catalyst. Although Mobil is correct in its argument, the Court need not address this argument at this time. Because the Court is addressing the dam-
ages for Amoco's infringement of Mobil's process patents separately from the damages for Amoco's infringement of Mobil's composition patent, the right to manufacture under the composition patent is irrelevant to the present finding that there is an established royalty for the rights infringed under Mobil's process patents.

Additionally, it is significant to note that Mobil's standard license agreements included several rights for which Amoco need not have obtained a license under the hypothetical negotiation including: (1) rights under *all* of Mobil's patents relating to VPI; (2) the right to Mobil's VPI know-how; (3) the right to Mobil's technical assistance; (4) worldwide patent rights; (5) process guarantees; and (6) indemnification. Smith Tr. 1382–85; DX 1939. Thus, if the Court were to depart from Mobil's standard, established royalty rates with respect to the process patents, it would most likely do so in a downward rather than upward direction.

Mobil argues that the Court's liability opinion precludes a finding of "comparable rights." In support of its argument, Mobil points to the Court's language that "the license agreement was intended to allow licensees to obtain VPI catalyst from … an authorized manufacturer" and that "Mobil has never licensed any third parties to make the VPI catalyst." *Mobil,* 779 F.Supp. at 1499, 1500.

The portion of the liability opinion relied upon by Mobil holds two things, neither of which support Mobil's argument on this issue: (1) the standard license agreement does not grant the licensee the right to manufacture its own catalyst under the '886 patent; and (2) Amoco defaulted on its license with Mobil because it failed to make the required royalty payments. *Mobil,* 779 F.Supp. at 1500–01. The fact that the license agreement does not grant the licensee the right to manufacture its own catalyst deals with the right to manufacture catalyst under the '886 patent and not the right to practice the VPI process. *See* Green Liability Tr. 894. The damages for Amoco's infringement of the right to manufacture and use an infringing catalyst will be determined *infra* at Section E. Here, the Court is concerned solely with fixing the appropriate amount of damages for Amoco's unauthorized use of the VPI process. Similarly, the Court's ruling that Amoco defaulted on its license and therefore is not entitled to rely upon its license as a defense to infringement does not affect the arguments at issue here.

After reviewing the entire record, the Court concludes that the rights infringed by Amoco under Mobil's process patents are "comparable" to the rights granted under Mobil's standard process license. Thus, the five criteria for an established royalty are satisfied and the Court concludes that Mobil had an established royalty with respect to the process patents infringed by Amoco in this case.

## D. *MOBIL'S ESTABLISHED ROYALTY IS A REASONABLE ROYALTY*

■ The Court's analysis is not complete upon finding that established rates exist for the rights infringed by Amoco under Mobil's process patents. Because section 284 prohibits the Court from awarding damages less than a reasonable royalty, the Court must also determine whether the established royalty is a "reasonable royalty." 35 U.S.C. § 284. As previously stated, almost all courts recognize that an established royalty may be too low to be "reasonable" under certain circumstances. *See, e.g.,* Chisum, 5 *Patents* § 20.03[2][d]. For example, courts have noted that established rates which are artificially depressed because the patent had not yet gained public recognition or acceptance or due to widespread infringement or to avoid challenges to the patent, may not constitute a reasonable royalty. *See id.; Nickson,* 847 F.2d at 798; *Trio Process,* 612 F.2d at 1359. For the reasons stated below, the Court finds that Mobil's established royalty on its process patents is a reasonable royalty.

## 1. MOBIL'S ESTABLISHED RATES ARE NOT ARTIFICIALLY DEPRESSED FOR ANY REASON

Courts have acknowledged that an established royalty rate should not be used to determine an infringer's damages where that rate has been artificially depressed. Mobil's own expert licensing witness, Mr. Evans, testified that Mobil's standard MVPI license and lease rates were not artificially depressed. Evans Tr. 1204.

### a. Established Rates Were Not Artificially Depressed Due to Widespread Infringement

It is undisputed that the standard MVPI rates were not set during a period of widespread infringement. Evans Tr. 1204; Friedlander Tr. 2230. Thus, Mobil's established rates cannot be found to be unreasonable on this basis.

### b. Established Rates Were Not Artificially Depressed to Avoid Challenges to the Patents

The evidence shows that the standard rates were not set artificially low to avoid challenges to the patent. To the contrary, Mobil recognized that its rates might be so high as to provoke challenges to the patents. As Mr. Huggett stated in November of 1976: "There is still sufficient incentive for the licensees to search for alternative solutions to avoid the heavy payments they have to make and we must be prepared to meet competition, perhaps by lowering our fees at some point." DX 1300–R.

Further, Mr. Penick testified that Mobil's licensing policy was to charge "as much as the market would bear" for its MVPI technology. Penick Tr. 788–89. Mr. Fagan confirmed this policy stating that it was his job to "make as much money as possible" on a long-term basis over the life of the licensing program. Fagan Tr. 2453–54. Moreover, Mr. Penick admitted that Mobil believed that its patent position was not likely to be challenged by others when the MVPI license and lease rates were first set. Penick Tr. 788. Mr. Huggett also testified that Mobil assumed its MVPI patents were valid when Mobil set its standard rates and began its licensing program. Huggett Tr. 1779–80.

In light of this evidence and the rest of the record, including expert testimony from both sides that Mobil's standard license and lease rates were not artificially depressed for any reason, Evans Tr. 1204; Friedlander Tr. 2230, the Court finds that Mobil's established rates were not artificially depressed to avoid challenges to the patents.

### c. Established Rates Were Not Artificially Depressed Because Mobil Set Them

Mobil also argues that its standard rates do not constitute a reasonable royalty because they were arbitrarily set and were not the product of negotiations. In support of its argument Mobil cites the *Trio Process* and *Rude v. Westcott* decisions.

Mobil's argument is both legally and factually unsupported. *Trio Process* does not stand for the proposition that rates that are set by the patentee cannot be deemed "reasonable" established rates. Rather, the Third Circuit in *Trio Process* stated:

> [T]here is no reason to believe that the license rate negotiated by the parties was anything other than a balanced consideration by both Goldstein and Trio of those competing concerns that normally enter into the determination of price in an open marketplace economy. Trio consistently offered licenses at the rate of $2,600 per furnace year. Thus, the possibility that Trio, had it chosen to do so, might have obtained a higher license rate than that actually charged is irrelevant.

*Trio Process*, 612 F.2d at 1361. The Court reads *Trio Process* as precluding Mobil's challenge to its standard rates solely on the ground that it might have obtained a higher rate. As interpreted by the Court, *Trio Process* stands for the broader proposition discussed above that a patentee should not be stuck with a rate that it set under conditions of widespread infringement or threat of litigation. As stated above and explained below, Mobil was not in such a circumstance with respect to its MVPI technology.

Mobil's argument that its standard rates cannot constitute a reasonable royalty because they were set arbitrarily and without negotiations is also without factual support. Mobil knew from the beginning that its MVPI technology was likely to be highly successful. DX 1347.1 ("MVPI represents a very attractive licensing prospect for Mobil."). While Mobil did have to set its rates somewhat arbitrarily because its potential licensees were not going to disclose their economic data, DX 1347.1 at 4, it did, however, "negotiate hard" with its potential licensees. DX 1357.

Moreover, the success of Mobil's negotiations is readily apparent. Mobil had approved a royalty of 25% of the low end of the estimated benefits or 0.15 cents per pound. DX 1288. As already explained, Mobil's standard rates start at 0.25 cents per pound for the first 200 million pounds of PX produced, drop to a rate of 0.20 cents per pound for the next 300 million pounds of PX and only reach the 0.15 cent per pound rate after the licensee produces more than 500 million pounds of PX. *See, e.g.,* DX 1357. Thus, Mobil was successful in its negotiations.

In addition, Mobil had the advantage of trying out its VPI technology at its Naples, Italy operation. In fact, Mr. Schwartz testified that from the Naples operation Mobil was aware of all of the technical benefits of its VPI technology in 1973. Schwartz Tr. 630–33. The Naples operation also permitted Mobil to quantify the economic advantages of its VPI technology over the prior technology before setting its standard rates. In February of 1974, Mobil conducted an initial comparison of MVPI versus Octafining, the most popular competitive process at its PX unit in Naples. DX 1347.1. This study showed the benefits of MVPI over Octafining at approximately 0.27 cents per pound of PX produced. *Id.* Mobil continued to study the advantages of the MVPI process at its Naples facility. Penick Tr. 806. In November of 1974, Mobil found that the economic advantages of the use of the MVPI process over Octafining at Naples were between 0.66 and 0.88 cents per pound of PX, more than double Mobil's initial estimate of 0.27 cents per pound only nine months earlier. DX 1348. The economic advantages of MVPI over Octafining increased yet again to as much as 1.0 cents per pound in February of 1975. DX 1288; DX 1289 (when put in new plants advantages of VPI technology rose to 1.4 cents per pound). Thus, it is clear that Mobil's standard rates were not arbitrarily set but rather were based upon Mobil's evaluation of the increasing economic benefits obtained at the Naples plant. In light of the evidence of Mobil's successful negotiations and its study and knowledge of the benefits of its MVPI technology before it began its licensing program, the Court finds Mobil's arguments to be without merit.

**d. Established Rates Were Not Artificially Depressed Because They Were Set When Mobil's Technology Was New**

Mobil next argues that its standard rates were not a reasonable royalty in 1980 because they were set in 1975 when the MVPI technology was unproven and its marketability was uncertain.

The record in this case does not support Mobil's argument. As previously found, Mobil continued to offer its MVPI technology at its standard rates to potential licensees until 1988, eight years after Amoco's infringement began. In addition, Mobil signed one of its licensees, Idemitsu, in April of 1980 at the very same rates it had established in 1975. If Mobil's standard rates really had become unreasonable to Mobil, it would not have continued to offer its technology at those same rates continuously up to 1988.

Mobil also forgets that it had the opportunity to increase its standard rates when it saw a "sudden change" in the acceptance of its VPI licensing terms in May of 1976. DX 1357. The change was so great that Mr. Huggett increased his projection of Mobil's licensing income five years out from $500,000 to $22,000,000. *Id.* Notwithstanding the "sudden change" and the fact that Mobil had signed up only one MVPI licensee at the time, Mobil maintained its standard rates and thereafter signed up ten more licensee/lessees at those rates. Six months later, in November of 1976, Mr. Huggett maintained that the licensing terms were "reasonable and fair" and even noted that Mobil must be prepared to meet competition by "perhaps lowering our fees" because the "heavy payments" provide sufficient incentive for the licensees to find alternative technology. DX 1300–R.

Moreover, Mobil continued studying the benefits of MVPI after it began licensing the technology in 1975. In 1976, Mobil estimated that the advantage of MVPI over Octafining was now up to a range from 2 to 4 cents per pound of PX produced. DX 1362; DX 1692. Although Mr. Penick testified that he was

unaware of such an increase in benefits,[9] a May 5, 1977 memorandum reporting on a meeting attended by Mr. Penick indicated that "MVPI had an incremental value of 3.6 cents per pound of PX over Octafining and in the second cycle it had 3.3 cents per pound" benefit over Octafining. DX 1516; Penick Tr. 844–49. Additionally, Mr. Fagan, who was "closer to the day-to-day aspects of licensing" Mobil's technology than Mr. Penick, Penick Tr. 790, testified that he "did not wish to" raise the MVPI rates even though he: (1) was aware that he was the person in a position to change the MVPI rates if there was any reason to do so, Fagan Tr. 2456; (2) had seen the documents indicating that MVPI had a 2–4 cents per pound advantage over Octafining, DX 1362; Penick Tr. 874; and (3) had admitted that he discovered there were additional benefits to the licensees, Fagan Tr. 2458. Despite this evidence of increased benefits and Mobil's claims that it would have raised its MVPI rates if it had known that the benefits of using MVPI were higher, Penick Tr. 799, Mobil made no move to increase its standard rates. Thus, when considered in light of the numerous rejections from prospective licensees and the significant accommodations given to several of Mobil's existing licensees, Mobil's established rates seemed to be too high rather than too low.

In addition, Professor Myers' testimony supports the finding that Mobil's established rates for the VPI process were a reasonable royalty. Professor Myers testified that "one of the most important lessons of economics ... is that the established market prices are the best measures of value" because they distill "all of the quantitative and qualitative factors that affect actual buyers and sellers, and influence what they pay." Market prices "are a kind of summary measure that is objective and inclusive of all the things that impinge on businessmen, or investors, or on you and me when we make transactions." Myers Tr. 1815. Thus, where the value of something has already been determined in market transactions, it is contrary to sound economics to "attempt a theoretical or conjectural calculation of what it ought to be worth." Myers Tr. 1818.

The market value of the process license in 1980 when Amoco began its infringement was the established royalty rate. This is the rate at which Mobil sold its technology to Idemitsu in April of 1980 and the rate that Mobil continued to offer to prospective licensees until at least 1988. Thus, in light of all of the evidence, the Court finds that Mobil's established royalty rates are reasonable.

**2. PANDUIT DOES NOT PRECLUDE AMOCO FROM A DAMAGES AWARD BASED UPON MOBIL'S ESTABLISHED RATES**

Mobil contends that *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978), precludes a damage award at Mobil's established rates as a matter of law because that would place Amoco in a "heads I win, tails you lose" situation. *Panduit* does not support that argument.

First, if *Panduit* were read as Mobil contends, a court could never find a patentee's established rates to be the damages which an infringer should pay.

Second, Amoco is not the type of infringer with which *Panduit* was concerned. The Sixth Circuit described that infringer as "a competitor which made no investment in research and development of the invention." Amoco was not a competitor of Mobil in the PX business or in the licensing of processes or catalysts to produce PX. Green Tr. 2375; Smith Tr. 1280, 1391. Also, Amoco spent over 5 million dollars to develop AMSAC and patented its new catalyst. Friedlander Tr. 2286.

In addition, the Court in *Panduit* described four different options such a competitor could take:

(1) it can make and sell a non-infringing substitute product, and refrain from making, using, or selling a product incorporating the patented invention; (2) it can make and sell the patented product, if the patent owner be willing, negotiating a license and paying a reasonable (negotiated) royalty; (3) it can simply take the invention, run-

---

9. Mr. Penick testified that until he retired in 1985 he was under the impression that the bene-

fits to the user of MVPI over Octafining was only 1.0 cents per pound. Penick Tr. 803.

ning the risk that litigation will ensue and that the patent will be found valid and infringed; or (4) it can take a license under option (2) and thereafter repudiate its contract, challenging the validity of the patent. Determination of a reasonable royalty, *after election of option (3)*, cannot, without injustice, be treated as though the infringer had elected option (2) in the first place.

575 F.2d at 1158–59 (emphasis added, footnote omitted). The *Panduit* court's concern over the "injustice" of the infringer paying only the established royalty was directed at option (3). Amoco followed option (4) by first taking a license and later challenging the validity of Mobil's patents.

In a footnote to option (4), the Sixth Circuit explained why former licensees should be treated differently. Citing to *Lear, Inc. v. Adkins*, 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969), it observed that good faith patent challenges—which licensees are uniquely suited to make—further "the important public interest in permitting full and free competition in the use of ideas." *Panduit*, 575 F.2d at 1159 n. 7. This Court has already found that this policy applies here: "The litigation in this case and the defenses presented by Amoco, although ultimately unsuccessful, were justified. The issues presented were close and the litigation of close issues serves a valuable function in the patent system." *Mobil*, 779 F.Supp. at 1501. Thus, Mobil cannot use *Panduit* as a basis for throwing out its established rates.

Further, based on this Court's findings in the liability trial that there was no willful infringement, 779 F.Supp. at 1487, and that the case was not exceptional, 779 F.Supp. at 1501, the Court has already found that Mobil is not entitled to attorney's fees or increased damages. Mobil cannot be permitted to "back door" these findings. "[T]he proper method of recognizing that an infringer is not like a willing licensee is to consider increased damages under Section 284 for willfulness or for attorney's fees under Section 285, *rather than artificially inflating the royalty rate.*" *American Medical Systems*, 794 F.Supp. at 1395 n. 15 (citing to *Fromson*, 853 F.2d at 1576 (Fed.Cir.1988) (emphasis added)).

For all these reasons, the award for infringement of Mobil's process patents shall be calculated by using Mobil's established MVPI license rates.

### E. DAMAGES FOR AMOCO'S INFRINGEMENT OF THE COMPOSITION OF MATTER PATENT

Next, the Court must determine the proper measure of damages for Amoco's infringement of Mobil's composition of matter patent.

### 1. MOBIL DID NOT HAVE AN ESTABLISHED ROYALTY FOR THE RIGHTS INFRINGED BY AMOCO UNDER THE COMPOSITION OF MATTER PATENT

Mobil did not have an established royalty rate for Amoco's infringing manufacture of catalyst under Mobil's composition of matter patent. Although Mobil makes much of the fact that the VPI catalyst lease agreement is not a patent license, Evans Tr. 1019; Smith Tr. 1262, the Court feels that this distinction for damages purposes is a mere technicality. *See* Friedlander Tr. 2243; Myers Tr. 1837–39. For the same reasons set forth above with respect to the process patents, Amoco has established the first four elements required to prove an established royalty. Amoco cannot, however, meet the fifth element: that the established rates are for comparable rights or activity under the patent.

Amoco admits that the right to make and use the infringing AMSAC catalyst under the composition of matter patent was not granted under the standard MVPI license agreement. D.I. 271 at 13. Amoco argues, however, that the value of that right was captured in Mobil's established catalyst lease rates. Amoco's arguments are summarized below:

(1) The evidence showed that Mobil's strategy was "to achieve as much revenue as Mobil thought it could from its licensing of its technology", Penick Tr. 788, and that the catalyst leasing program was "a part of the program to maximize income to Mobil." Penick Tr. 840. Mr. Penick charged his subordinates, including Mr. Fagan, with the mission of achieving the "maximum overall revenue that the market would bear." Pen-

ick Tr. 788–89, *see also* Huggett Tr. 1734–35. Given this strategy, and Mobil's loosening of its ZSM–5 sampling and manufacturing policies discussed *infra,* Section F, discussion of *Georgia–Pacific* Factor 4, it is not credible to believe that a sophisticated company like Mobil would lease catalyst rather than license its manufacture if it thought the latter would be more profitable. Myers Tr. 1836.

(2) Mobil's standard lease itself indicates that the value of the manufacturing right is included in the established lease rates. Section 10.03 provides:

> In the event Mobil decides to discontinue the manufacture of VPI Catalyst, Mobil shall give Lessee notice of such discontinuance and shall make VPI Catalyst manufacturing technology and know how available to at least one (1) reputable catalyst manufacturer on terms satisfactory to Mobil so that VPI Catalyst would be commercially available.

DX 1290 at § 10.03.

(3) Mobil suffered no loss from Cyanamid's manufacture of catalyst for Amoco beyond not receiving its standard catalyst lease revenue from Amoco. Amoco never sold, leased or licensed catalyst in competition with Mobil. Friedlander Tr. 2233–34; Evans Tr. 1194. Mobil presented no evidence that any licensee or prospective licensee of Mobil did or did not do anything because Amoco's catalyst was made by American Cyanamid and not Mobil. Smith Tr. 1390; Friedlander Tr. 2234. Mr. Green conceded that Mobil had no evidence of any damage it suffered as result of Amoco's having its AMSAC catalyst manufactured by another other than not receiving its standard license and lease revenue. Green Tr. 2380–82. Indeed, Mobil suffered no additional loss and will receive millions of dollars for the use of catalyst for which it had incurred no expense in producing. Myers Tr. 1835.

(4) Amoco obtained no added value from having American Cyanamid manufacture catalyst for it beyond what all licensees obtained under the standard MVPI catalyst lease. Like the MVPI licensees, all Amoco needed was a supply of catalyst for its own PX production. Amoco was not in the catalyst manufacturing business and was indifferent to who manufactured the AMSAC catalyst for it. Fligg Tr. 1533; Myers Tr. 1834. Amoco did not use the manufacturing right to produce catalyst for sale or lease in competition with Mobil. Indeed, rather than obtaining any added value, Amoco will pay twice for catalyst—once to American Cyanamid for the catalyst it did use and now to Mobil for the supply of catalyst it did not use. Friedlander Tr. 2233.

(5) Mobil did not prove a value for the manufacturing right even though Mobil did license several companies to make ZSM–5 catalyst. DX 1970; *see infra* Section F discussion of *Georgia–Pacific* Factor 4.

Thus, Amoco concludes that the requirement that the rights used by the infringer be "comparable" to those licensed at the established rate is satisfied here.

The Court cannot agree. Even assuming that the *value* of the catalyst manufacturing right infringed by Amoco is subsumed in Mobil's standard lease rates, the Court finds that the rights infringed by Amoco under the '886 patent, including the right to manufacture its own catalyst, are not "comparable" to the rights granted under Mobil's standard MVPI lease agreements. This is because Mobil never granted any MVPI licensee/lessee the right to manufacture catalyst under the '886 patent for use in xylene isomerization. Penick Tr. 741–42. Thus, the rights infringed by Amoco under the composition of matter patent are not comparable to the rights given to Mobil's standard catalyst lessees. Accordingly, the Court must rely on another theory of damages to determine a proper award for Amoco's infringement of Mobil's composition of matter patent.

## 2. *THE APPROPRIATE MEASURE OF DAMAGES FOR AMOCO'S INFRINGEMENT OF MOBIL'S COMPOSITION OF MATTER PATENT IS THE LOST PROFITS CAUSED BY THE INFRINGEMENT*

### a. *THE LAW: LOST PROFITS ANALYSIS*

"The general rule for determining the damages to a patentee that is itself pro-

ducing the patented item is to determine the sales and profit lost to the patentee because of the infringement." *Del Mar Avionics,* 836 F.2d at 1326; *see also SmithKline Diagnostics, Inc. v. Helena Laboratories, Corp.,* 926 F.2d 1161, 1165 (Fed.Cir.1991); *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 616 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). In order to obtain lost profits as a measure of damages, the patentee must prove: (1) causation, *i.e.,* that "but for" the infringement there is a "reasonable probability" that the patentee would have made the infringer's sales; and (2) a reasonable approximation of the patentee's lost profits. *See, e.g., BIC Leisure Products,* 1 F.3d at 1218. A patentee can satisfy the causation requirement in at least one of two ways. The first way requires the patentee to show that it and the infringer were the only suppliers in a two-supplier market. *See, e.g., Andrew Corp. v. Gabriel Electronics, Inc.,* 785 F.Supp. 1041, 1043 (D.Me.1992). The second way to satisfy the causation requirement is to meet the four elements of the *Panduit* test by showing: (1) a demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) the manufacturing and marketing capability to exploit demand; and (4) the amount of profits the patentee would have made. *Id.* (citing *Panduit,* 575 F.2d at 1156).

### b. *APPLICATION OF THE LAW TO THE FACTS OF THIS CASE*

 Although this case is unique in that Amoco, the infringer, supports the application of a lost profits analysis while Mobil, the patentee, does not, the Court finds that an award of lost profits fully compensates Mobil for Amoco's infringement of the composition of matter patent. As the patentee, Mobil was producing and leasing [10] the patented item, ZSM–5 catalyst for use in xylene isomerization. As the infringer, Amoco was also producing the patented item. Amoco did not, however, sell or lease its catalyst to others but rather used all of the infringing catalyst that it produced in its own PX pro-

duction. Nonetheless, it is clear that "but for" Amoco's infringement a "reasonable probability" exists that Mobil would have made the infringer's sales (albeit sales Amoco made to itself).

Prior to Amoco's infringement, Mobil was the only manufacturer of ZSM–5 catalyst for use in xylene isomerization and, as is clear from the record, Amoco leased its supply of such catalyst from Mobil. Amoco later infringed Mobil's '886 composition of matter patent by manufacturing and using its own ZSM–5 catalyst for xylene isomerization. After Amoco's infringement, Mobil and Amoco were the only suppliers in a two-supplier market. Accordingly, a reasonable probability exists that but for Amoco's infringement, Mobil would have made all of Amoco's sales of the infringing catalyst.

The evidence in this case also shows within a reasonable probability that Mobil would have made Amoco's infringing sales under the *Panduit* test. Mobil was in the business of manufacturing and leasing the MVPI catalyst covered by its composition patent. Smith Tr. 1320. Amoco was using MVPI catalyst leased from Mobil at its Decatur PX unit until infringement began through the installation of AMSAC in May, 1980. Amoco continued using MVPI catalyst leased from Mobil at its Texas City 1 and 2 units until 1983 and 1984, respectively, when AMSAC was installed. First, Amoco had a demand for the patented catalyst which it satisfied with its own infringing catalyst. In addition, Mobil was manufacturing and supplying the patented catalyst to its other lessees. Second, Amoco did not have acceptable non-infringing substitutes. By the very act of its infringement, Amoco shows that it thought it did not have an acceptable non-infringing substitute. *See, e.g., Panduit,* 575 F.2d at 1160–62. Of the alternatives to AMSAC, MVPI offered the greatest cost savings. Schwartz Tr. 607–610. The non-infringing alternatives, Isomar, Octafining and Amocofining are not acceptable for the reasons discussed, *infra* Section F discussion of *Georgia–Pacific* Factor 9. Third, the record es-

---

**10.** For purposes of a lost profits analysis, whether the patentee sells or leases the patented item it manufactures is of no moment. *Kori Corp. v.*

*Wilco Marsh Buggies and Draglines Inc.,* 761 F.2d 649, 653–55 (Fed.Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

tablishes that Mobil had the manufacturing and marketing capability to exploit Amoco's demand. Mobil had adequately supplied Amoco's need prior to Amoco's infringement and no evidence was offered that it could not have continued to do so. Thus, there is at least a reasonable probability that Amoco would have continued to lease MVPI catalyst from Mobil for use at all three of its PX units had it not infringed with AMSAC.

The second element necessary to establish lost profits and the fourth and final *Panduit* element is a showing of a reasonable approximation of the patentee's lost profits. When Amoco replaced the MVPI catalyst with AMSAC, Mobil lost the MVPI lease payments it would have received from Amoco. Mobil suffered no lost catalyst profits beyond these lease payments because Amoco did not make its AMSAC catalyst available to anyone else or take any other sales (leases) away from Mobil. Green Tr. 2380–82; Friedlander Tr. 2232–37. Mobil introduced no evidence at trial of any other losses. Hence, a reasonable approximation of Mobil's lost profits is the lease payments Mobil would have received from Amoco.

The Court recognizes that an award of the catalyst lease payments Amoco would have made to Mobil is greater than Mobil's lost profits because it does not take into account Mobil's cost of manufacturing the catalyst. The ability to establish Mobil's lost profits with precision was hampered by Mobil's position that a reasonable royalty is the only correct and appropriate measure of damages in this case. Thus, during the trial Mobil did not attempt to prove its lost profits.

The Court notes that the amount of damages need not be proven with "unerring precision" and sometimes the trial court may need to approximate damages. *Del Mar Avionics,* 836 F.2d at 1327 (citations omitted). Moreover, "when the amount of the damages is not ascertainable with precision, reasonable doubt is appropriately resolved against the infringer." *Id.* Thus, Amoco, as the infringer, must bear the risk of any uncertainty with respect to damages. In addition, Amoco has waived its right to object to the Court's calculation of lost profits on this basis by advocating such an award.

Accordingly, the Court finds that Mobil is entitled to its lost lease payments under its standard MVPI lease agreement as damages for Amoco's infringement of Mobil's composition of matter patent.

## F. *A HYPOTHETICAL NEGOTIATION WOULD PRODUCE THE SAME DAMAGES AWARD*

Even were the Court to engage in a hypothetical negotiation analysis as urged by Mobil, the Court would arrive at the same damages award as it did by applying the established royalty and lost profits approaches.

### 1. *THE LAW: HYPOTHETICAL NEGOTIATION TO DETERMINE A REASONABLE ROYALTY*

A reasonable royalty has been defined as the amount that a person who wants to manufacture, use or sell a patented product would be willing to pay as a royalty and yet be able to make a reasonable profit. *See, e.g., Wang Laboratories, Inc. v. Toshiba Corp.,* 993 F.2d 858, 870 (Fed.Cir.1993) (citations omitted). As previously explained, when there is no other way to determine the measure of damages in a patent case, courts engage in a "hypothetical negotiation" analysis to determine a reasonable royalty for the use the infringer made of the patented invention. *See, e.g., SmithKline,* 926 F.2d at 1168; *Hanson,* 718 F.2d at 1077; *Studiengesellschaft,* 666 F.Supp. at 680. Under this analysis, the Court is to determine what royalty a willing patentee and willing licensee would have arrived at if they had negotiated a license. *Id.,* 666 F.Supp. at 680. An award based upon a reasonable royalty, just like any other damages award, must be aimed at compensating the patentee for the infringement. 35 U.S.C. § 284.

The hypothetical negotiation takes place on the date that defendant's infringement began. *Wang Laboratories,* 993 F.2d at 870; *Hanson,* 718 F.2d at 1079; *Panduit,* 575 F.2d at 1158. Additionally, for purposes of the hypothetical negotiation, Mobil's patents are deemed unquestionably valid and enforceable and will be infringed by

Amoco if the parties do not negotiate a license. *TP Orthodontics, Inc. v. Professional Positioners, Inc.*, 20 U.S.P.Q.2d 1017, 1025 (E.D.Wis.1991), *modified on other grounds,* 22 U.S.P.Q.2d 1628, 1992 WL 189670 (E.D.Wis.), *aff'd,* 980 F.2d 743 (Fed.Cir.1992). The Court must also assume, for purposes of the hypothetical negotiation, that all parties would have known all relevant information. *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1121 (S.D.N.Y. 1970), *modified and aff'd,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971); *TP Orthodontics,* 20 U.S.P.Q.2d at 1025. Moreover, in conducting the hypothetical negotiation, the Court is permitted to look to events and facts that occurred after the infringement began. *Fromson,* 853 F.2d at 1575–76.

In *Georgia–Pacific,* the District Court for the Southern District of New York described fifteen factors as a "comprehensive list of evidentiary facts relevant ... to the determination of the amount of a reasonable royalty for a patent license." *Georgia–Pacific,* 318 F.Supp. at 1120. In performing a hypothetical negotiation analysis, it is important to recognize that some of the *Georgia–Pacific* factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to fit the facts of the case at hand.

### 2. *APPLICATION OF THE HYPOTHETICAL NEGOTIATION TO THE FACTS OF THIS CASE*

█ In conducting the hypothetical negotiation, the Court looks at all of the patent rights infringed to attempt to find one "reasonable royalty." In addition to the fact that a single negotiation was preferred by the experts who testified in this case, a single negotiation also best serves the interests of judicial economy. The Court notes, however, that if it had conducted two separate negotiations, one for the process patents and one for the composition of matter patent, it would have arrived at the same reasonable royalty rate.

Mobil argues that Amoco, having forfeited its license when commencing infringement, must enter the hypothetical negotiation as a hypothetical licensee and not an MVPI licensee. *See Stickle,* 716 F.2d at 1563 ("[I]n determining a reasonable royalty in hypothetical negotiations, a willing 'hypothetical' licensee would not have been a party to any prior transactions...."). Mobil's argument does not permit the Court or the parties to the hypothetical negotiation to take into account the true situation of the parties. In addition, although the law supports Mobil's argument, Mobil relies on its past MVPI licensor/licensee relationship with Amoco whenever it is convenient to Mobil. For example, Mobil argues that the fact that Amoco had three and a half years of experience with MVPI at the time of the hypothetical negotiation shows that Amoco knew the value of Mobil's technology, needed no technical assistance, process guarantees, etc. and took little or no technical risk in installing AMSAC at its PX plants. In light of Mobil's inconsistent assertions, the Court finds that Mobil has waived its right to object to the Court's consideration of the true situation of the parties. The Court, however, does not deem Amoco to be an MVPI licensee/lessee for purposes of the hypothetical negotiation.

a. **FACTOR 1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

Courts and commentators alike have recognized that the royalties received by the patentee for the licensing of the patents in suit is the "most influential factor" in determining a reasonable royalty. *See, e.g.,* Chisum, 5 *Patents* § 20.03[3] at 20–159. As already explained, the Court has found that Mobil had established royalty rates for the process patents infringed by Amoco. Assuming the Court was wrong to conclude that Mobil had established rates with respect to its process patents, the Court would consider the same evidence discussed, *supra,* Section C, in determining a reasonable royalty to compensate Mobil for Amoco's infringement.

Although the Court could not find that Mobil had an established royalty rate for Amoco's infringement of the composition of matter patent, the Court recognized that the value of the catalyst manufacturing right was

subsumed in Mobil's lease rates. *See* discussion *supra*, Section E, regarding the lack of an established rate for Mobil's composition patent.

b. ***FACTOR 2:*** **The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

Mobil argues that this factor does not apply to the present case because Amoco did not offer any evidence of rates paid by it for the use of *other* patents comparable to the patents in this suit. In the spirit of the *Georgia–Pacific* decision, the Court interprets this factor broadly to include rates for other technology available to produce PX.

Both Mobil's and Amoco's experts agreed that the price of comparable technology is of primary importance in determining a royalty rate. Evans Tr. 1202. Moreover, Mobil itself recognized the importance of comparables in its pricing of the MVPI catalyst. For marketing reasons, Mobil priced its MVPI catalyst on a "cost neutral" basis so that the cost to licensees for the MVPI catalyst was the same as the cost to them for the Octafining catalyst they had previously been using. Friedlander Tr. 2245–46; Green Tr. 2365–66, 2369. By pricing the MVPI catalyst to be cost neutral to the inferior Octafining catalyst, Mobil was seeking to take advantage of the economic benefits of its technology through its MVPI process licenses. DX 1347.1 at M1055615 ("[W]e will exploit the technological advantage through royalties and not through an inflated catalyst sales price."); *see also* Friedlander Tr. 2246; DX 1544 at M1192435. The "cost-neutral" principle was also used by Mobil in setting the lease rate for its improved MHTI catalyst and for Teijin's custom DEIP catalyst so that MHTI and DEIP did not cost Mobil licensees more than the MVPI catalyst. Friedlander Tr. 2246–47, 2251; DX 1550 at M200104.

Amoco produced comparison charts compiled by Mr. Sims showing the effective license rates per pound of PX for various xylene isomerization processes and the effective rates per pound of catalyst for the associated catalysts. DX 1801–G1; DX 1801–G2; Sims Tr. 2115–18; Friedlander Tr. 2247–54. With respect to license rates, the charts show

that the rates for most other xylene isomerization processes were below the standard MVPI rates. Only two processes had higher rates, MLPI and MHTI, which were Mobil's own improved processes. Friedlander Tr. 2248–49. Even then, the incremental increase in royalties was very small, approximately 0.05 cents per pound for MLPI and another 0.025 cents per pound for MHTI. DX 1801–G1; Smith Tr. 1418–19. The rates charged to Teijin for its DEIP and BDEIP processes were lower than the MVPI rates.

With respect to the catalysts, MVPI falls in about the middle of the range of rates per pound. However, as discussed above, the cost to the licensee for the Octafining, MHTI and DEIP catalysts was the same as for the MVPI catalyst. Further, Mr. Sims calculated that the cost to Teijin for the BDEIP catalyst was 47.8% less than the cost of MVPI catalyst. Sims Tr. 2095–96. Therefore, at least four of the six other catalysts shown in the comparable chart cost the same or less than MVPI catalyst.

To pass a reality check, a reasonable royalty should fall within the cost range of the processes and catalysts shown in these comparable charts. Friedlander Tr. 2247–48. The 2.15 cents per pound royalty argued for by Mobil does not even fall on the chart much less within those ranges. Friedlander Tr. 2251–52.

While the Court recognizes that the Teijin situation is different from the present case in eight respects, an examination of Teijin sheds light on what would constitute a reasonable royalty in this case. As mentioned above, Mobil had a policy of granting concessions or accommodations to its licensees. The concessions Mobil granted to Teijin are particularly significant in that they were given *after*, and in spite of, Mobil's discovery that Teijin had likely violated Mobil's non-analysis policy to develop Teijin's new custom ZSM–5 catalyst. Green Tr. 2396–97; DX 1520; DX 1521; DX 1546; DX 1561. Amoco, like Teijin, developed a custom catalyst.

Rather than penalize Teijin, Mobil agreed to manufacture and supply Teijin's custom catalyst (DEIP) at a significant reduction

from the standard MVPI rates. DX 1564. Mr. Sims calculated that the concession Mobil granted to Teijin for the DEIP catalyst amounted to a 63.6% reduction in Mobil's standard MVPI license rates. DX 1800–I1; Sims Tr. 2091.

In 1984, Teijin requested that Mobil manufacture another custom xylene isomerization catalyst (BDEIP) developed by Teijin. DX 1551; DX 1309; DX 1310. Again, the financial terms of the BDEIP arrangement reflected a significant reduction from Mobil's standard rates—47.8% as calculated by Mr. Sims. DX 1800–M1; Sims Tr. 2093–96.

Mobil offered several arguments in an effort to distinguish the Teijin situation (Mobil's Damages Pre–Trial Memorandum 33–35), including that Mobil received certain grant-back rights from Teijin, that Teijin's right to manufacture PX was limited to Japan and that Teijin did not receive the right to make the catalyst. However, as Mr. Sailor testified on behalf of Mobil, it did not attribute any value to a grant-back of BDEIP "other than value due to its filling the needs of Teijin." Sailor, quoted at Penick Tr. 895. Further, although Teijin received a discount on MVPI rates for use of the catalyst in Japan, there was no restriction as to where the PX it produced could be sold and Teijin could use its custom catalyst anywhere in the world outside Japan at Mobil's established MVPI rates. DX 1564; DX 1309; DX 1310. In light of this evidence, Dr. Friedlander concluded that at a hypothetical negotiation between Mobil and Amoco, Mobil's established rates would be reduced to those charged to Teijin because Teijin is the most "comparable" situation to the instant case. Friedlander Tr. 2250.

As previously stated, the Court acknowledges that the Teijin situation is different from the present case in several respects. However, Mobil's conduct with respect to Teijin, in addition to its granting of concessions to other VPI licensees/lessees, reinforces the Court's conclusion that Mobil was willing to depart downward from its standard rates. Moreover, in the Teijin situation Mobil departed downward from its standard rates when faced with conduct that it thought to be infringing. This, and other evidence in the record, show that Mobil was likely to have adopted a similar attitude with respect to Amoco's infringement. *See, infra*, discussion at *Georgia–Pacific* Factor 4.

c. *FACTOR 3:* **The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

In a hypothetical negotiation Amoco would only need to negotiate for the patent rights that it was held to have infringed. Smith Tr. 1382. Thus, in the present case Amoco need only negotiate for the following rights: (1) the right to make or have made and use infringing catalysts under the '886 patent; (2) the right to use infringing catalysts for xylene isomerization under the '857 patent; and (3) the right to use infringing catalysts to practice xylene isomerization under the '872 patent. D.I. 273 at 2, ¶ B1.1.

Comparison of the rights needed by Amoco in the hypothetical license to the terms of the standard MVPI license and lease shows that the hypothetical license would be narrower in a number of respects. Specifically: (1) the hypothetical license would include rights only under the three infringed patents rather than under all of Mobil's patents relating to MVPI; (2) there would be no grants of know-how or technical assistance to Amoco; (3) the rights would be limited to the U.S. rather than being worldwide; (4) there would be no process guaranties; and (5) there would be no indemnification. Friedlander Tr. 2255–58; DX 1939; Smith Tr. 1382–85.

However, the hypothetical license would be broader than Mobil's standard license/lease arrangement in two ways: (1) Amoco will have obtained the right to have its AMSAC catalyst manufactured rather than leasing it from Mobil; and (2) it will not include any grantback from Amoco to Mobil of rights relating to AMSAC. Friedlander Tr. 2327. As previously explained, *supra*, Section E, Amoco received no added value and Mobil suffered no added loss as a result of Amoco having AMSAC catalyst manufactured elsewhere. In trying to determine a value for the manufacturing right, it is important to

consider that Amoco manufactured its AM-SAC catalyst for its use alone.

Mobil strenuously argues that it would not have licensed the right to manufacture catalyst for use in xylene isomerization, its "jewel", readily or cheaply. In fact, Mobil never granted the right to manufacture ZSM–5 catalyst for xylene isomerization under the '886 composition of matter patent. Penick Tr. 741; Green Tr. 2416; Evans Tr. 1051. Although Mobil's argument is undercut somewhat by its distribution of samples of ZSM–5 crystals and the granting of the right to manufacture ZSM–5 for other uses, *see* discussion of *Georgia–Pacific*, Factor 4 *infra*, the Court acknowledges that Mobil would have been unlikely to license this catalyst manufacturing right for an amount below its standard lease rates.

d. *FACTOR 4:* **The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

Mobil's policy was "to license technology developed for internal use to others when it is judged that potential licensing income would substantially exceed any loss of competitive position that might result." PX 2367 at M2324600. In accordance with this policy, Mobil decided to aggressively license the process patents at issue in this suit and did, in fact, do so. DX 1347.1. Amoco had been a Mobil MVPI licensee under the patents-in-suit. Even had it not been, Mobil would have granted Amoco the standard MVPI license and lease at the established rates in May of 1980. Smith, quoted at Dugan Tr. 400; *see also*, discussion *supra*, Section C.

As the largest PX producer in the U.S., Amoco was exactly the type of licensee for which Mobil was looking. Smith Tr. 1388; Friedlander Tr. 2264.

The issue becomes a bit more complicated when the right to manufacture catalyst under the composition of matter patent is considered. Mobil did not originally seek to license that right but ultimately did so. Mobil considered its ZSM–5 catalyst to be the "jewel" of its catalyst knowledge. Huggett Tr. 1679–80; Penick Tr. 699. Originally, Mobil's licensing policy was to reserve to itself the exclusive right to manufacture ZSM–5 catalyst. Green Tr. 2403–04; Penick Tr. 740–42. Moreover, Mobil adopted a "very strict, very careful policy" not to license rights under its catalyst composition patent and not to allow analysis of its licensed MVPI catalyst compositions. Evans Tr. 1045–46; PX 2629; PX 2630; PX 2543.

Mobil determined that reserving the exclusive right to make ZSM–5 catalyst would maximize its long term revenue because of new uses for its catalyst. Green Tr. 2408.[11] Mobil also determined that reserving the exclusive right to manufacture ZSM–5 would maximize its long term revenue from its licensing and leasing businesses. This is because Mobil believed that ZSM–5 had great potential for "large increases in license and catalyst lease revenues" in areas outside of xylene isomerization. Penick Tr. 740. As MVPI and then other ZSM–5 based technologies began to grow, Mobil started to build a lucrative catalyst business. Green Tr. 2404–06. The nine ZSM–5 based industrial processes that were licensed by Mobil show the tremendous interest and potential that ZSM–5 had.[12] Evans Tr. 1041–42; PX 1253.

Mobil had two primary reasons for leasing its MVPI catalyst instead of selling it: (1) to

---

**11.** For example, in 1980, the price of crude oil was at an all-time high with predictions of one hundred dollars per barrel by the 1990's. Mobil anticipated huge growth in its ZSM–5 based technology for producing synthetic fuel by converting methanol to gasoline. Mobil thought that the unique ZSM–5 chemistry could be hugely profitable in converting gaseous energy or coal to liquid fuels. Because Mobil intended to use such developments itself, it had little interest in letting others develop ZSM–5. Penick Tr. 757; Green Tr. 2406–07.

**12.** It is interesting to note, however, that the royalties and lease payments received by Mobil from all of its licensees under all nine ZSM–5 based processes from 1976 to 1989 (about 369 million dollars) are less than the 400 million dollars Mobil is currently seeking as royalties for Amoco's infringement. PX 1251; PX 1253; Green Liability Tr. 818–29.

maximize its profit, Evans Tr. 1030–31; and (2) to safeguard its confidential proprietary catalyst information by prohibiting others from acquiring title or control of the catalyst, Penick Tr. 740–41, 836–37.

The standard MVPI lease has very conservative and restrictive provisions which preclude sampling or analysis. Evans Tr. 1033–34; PX 2538, § 6.04. It strictly limits access to Mobil's standard catalysts "under terms and conditions which will safeguard Mobil's confidential proprietary information concerning the VPI Catalysts and prevent sampling of the VPI Catalysts." *See, e.g.,* PX 2538 at 1. The standard MVPI lease also provides that Mobil has the right to have an observer present to monitor the loading, unloading and regeneration of catalyst. PX 2538, § 6.05. Moreover, all of Mobil's MVPI license agreements had most favored nation clauses. D.I. 240 at Exhibit J–2.[13]

Mobil charged all MVPI licensees and lessees the same rates for the same standard MVPI catalyst. Penick Tr. 683; Fagan Tr. 2536; Huggett Tr. 1706, 1709–10, 1713, 1719; Green Tr. 2370. Although the standard license agreement grants licensees the right to use any "catalyst suitable for use in the VPI Process which comprises a ZSM–4, 5, 11, 12, 35 or 38 crystalline aluminosilicate zeolite," DX 1296 at § 1.3, Mobil was the only (non-infringing) manufacturer of such a catalyst. *Mobil,* 779 F.Supp. at 1499.

Mobil's licensing policy was to set the royalty as a portion of "the economic advantage of the licensed process to the licensee, over and above the licensee's next best alternative." PX 2634 at M1055885; Penick Tr. 681; Green Tr. 2401. However, because potential licensees are often reluctant to share the precise economics of their facility, Green Tr. 2423–24, in making comparisons between Mobil's technology and competing technologies, Mobil was frequently required to use a more generic analysis, relying on internal and published information. Green Tr. 2423–24; Penick Tr. 679–80.

Mobil followed this policy for MVPI, using its 0.6 to 1.0 cents per pound estimated benefit of MVPI over Octafining based on its commercial experience at Naples. Once Mobil set its standard rates, however, Mobil kept its terms "consistent and uniform in an attempt to meet its objective of licensing all potential licensees [and because it] was good business practice to license all comers at the same rate." D.I. 273 at 5 (citing Huggett Tr. 1734; Fagan Tr. 2513).

Mobil's licensing policy was to set its royalty rates as high as possible without inducing infringement. Penick Tr. 691; Green Tr. 2401; PX 2634 at M1055888. Yet, as already found, Mobil did not set its rates artificially low to avoid challenges to their patents. *See, supra,* Section D. Mobil points to Mr. Fagan's testimony to assert that Mobil had a general policy of setting the licensing fee at 25% to 33% of the economic benefit over the next best competing process. Fagan Tr. 2512. The Court notes, however, that Mr. Nelson, President of Mobil, initially sought a royalty of 25% of the low end of the benefits of MVPI over the prior technology. DX 1288. Moreover, with respect to ZSM–5 generally, Mobil seemed to strive toward a royalty of 20% of the estimated cost advantage. *See* DX 1839; DX 1454 at MB2012571; DX 1455 at MB2012630; DX 1543 at M1192204.

Mobil also produced evidence that its lease fee for its standard MVPI catalyst equated to 0.12 cents per pound of PX or 12% of the 1.0 cents per pound of PX economic benefit of MVPI over Octafining realized at Mobil's Naples facility. Penick Tr. 687; Huggett Tr. 1785–86; PX 2627. The Court notes, however, that Mobil has also asserted that its lease rates were designed to be "cost-neutral" to the Octafining catalyst. *See, e.g.,* Green Tr. 2356–66, 2369. Moreover, Mobil did not produce any witnesses or evidence to explain how the 12% was calculated or how it connected with the cost-neutral rationale. The Court does not find the 12% figure to be adequately supported in the record. Thus, the Court is unable to accept Mobil's assertion that the total MVPI license royalty and

---

13. Interestingly, Amoco argues that the hypothetically negotiated license would also contain a most favored licensee clause so that after May of 1980 Amoco would be able to take advantage of the concessions granted by Mobil to its MVPI licensees, Teijin, Idemitsu and St. Croix. D.I. 275 at 10.

lease fee amounted to 0.37 cents per pound of PX or 37% of the 1.0 cents per pound economic benefit of MVPI over Octafining estimated at Mobil's commercial Naples unit.

In the late 1970's, Mobil's confidentiality policies with respect to ZSM–5 started to loosen. In September of 1979, Mobil changed its longtime policy prohibiting the distribution of samples of ZSM–5, DX 1365; Penick Tr. 906–09, because "any technically competent laboratory that wanted to make [ZSM–5] ha[d] done so by following [Mobil's] patent literature" and competitors, including BASF, W.R. Grace, Monsanto, Union Carbide and Chevron had "made some version of ZSM–5 and were experimenting with it" and developing applications for the technology. DX 1365; Penick Tr. 906–09. Accordingly, Mobil decided to give out ZSM–5 samples "without excessive restriction", instead relying on its "patent position and know-how" to protect its market position. DX 1365.

Moreover, Mobil broke with its policy against licensing others to manufacture ZSM–5.[14] Universal Oil Products ("UOP") approached Mobil and requested the right to make ZSM–5 crystals for use in its "Cyclar" process. In December, 1982, Mobil agreed to grant UOP the right to make ZSM–5 for use in a "Cyclar" process.[15] In July of 1983, Mobil granted Chevron the right to make ZSM–5 for a lube dewaxing application. Penick Tr. 752–56. Moreover, beginning in 1985, Mobil licensed W.R. Grace and others to make ZSM–5 crystal as an additive for fluid catalytic cracking catalyst (FCC).[16] In 1980, Union Carbide requested a license to manufacture ZSM–5 under the '886 patent, which Mobil denied. Penick Tr. 719–21, 749–

50. In the early 1980's, Union Carbide offered infringing embodiments of ZSM–5 to Mobil's licensees and prospective licensees. Penick Tr. 751. Union Carbide initiated litigation against Mobil in September of 1982. Penick Tr. 748. In settlement of the litigation in 1985, Mobil licensed Union Carbide the right to manufacture specific ZSM–5 catalysts for use in narrowly defined fields outside of xylene isomerization. Green Tr. 2413, 2421–23. Thus, it is clear that Mobil's confidentiality concerns dramatically decreased over the years. And although Mobil originally would not have permitted licensing of the right to manufacture ZSM–5 catalyst, Mobil eventually did so.

In addition, Mobil's own documents show that it was contemplating letting Amoco manufacture AMSAC at a discount from the established MVPI rates. Mr. Penick authorized Mr. Huggett to send Amoco a letter offering a deal under which Amoco could "legally use whatever catalyst it feels is best suited for its purposes." DX 1373; Penick Tr. 927–28; Myers Tr. 1967. Pursuing that matter further, Mobil considered allowing Amoco to manufacture the AMSAC catalyst for *less* than the standard MVPI lease rate. DX 1373; DX 1374; Friedlander Tr. 2237–38. Mr. Fagan viewed this as an effort to "keep Amoco within the fold" of Mobil licensees. DX 1374; Fagan Tr. 2494–2496.

Although Mobil granted UOP, Chevron, W.R. Grace and Union Carbide the right to make ZSM–5 for non-xylene isomerization uses subsequent to 1982, Mobil asserts that it would not have granted Amoco the right to make AMSAC catalysts for xylene isomeriza-

14. Mobil claims that every agreement in which Mobil granted the right to make ZSM–5 occurred at least two years after the May, 1980 hypothetical negotiation and would not be known to the negotiators at the hypothetical negotiation. Friedlander Tr. 2309–10. Mobil seems to forget, however, that the Court is permitted to peek forward to events and facts that occurred after the infringement began.

15. Mobil argues that it did not consider the Cyclar process to be promising technology that it might want to use it itself and believed that it could generate some revenue by licensing the right to manufacture ZSM–5 under suitably controlled terms. However, the Court notes that

this is the very same reason that Mobil originally decided to license its ZSM–5 technology for use in xylene isomerization. *See* DX 1347.1.

16. Mobil explained that the primary reason it permitted FCC catalyst manufacturers to make catalyst is that leasing did not seem logical since FCC catalyst attrites quickly compared to fixed bed applications. Green Tr. 2426–27; Evans Tr. 1028–29. Parties receiving ZSM–5 crystal from Mobil for FCC applications were precluded from analyzing it and limited to the form of catalyst and concentration of ZSM–5, thereby reducing the chances of harming Mobil's position in ZSM–5 catalyst leasing or technology development. Green Tr. 2427.

tion in 1980.[17] Penick Tr. 755–756. In support of that conclusion, Mobil points to the fact that it has never licensed the right to manufacture ZSM–5 for use in xylene isomerization. Penick Tr. 741; Green Tr. 2416; Evans Tr. 1051.

The Court disagrees with Mobil. The evidence shows that Mobil would have been likely to permit Amoco to manufacture its AMSAC catalyst under the condition that the catalyst was for Amoco's use only. Specifically, Mobil granted others the right to manufacture ZSM–5; it granted concessions to its other licensees whenever asked to do so; it considered Amoco a valuable licensee (or a valuable potential licensee); it knew that Amoco was having problems with its MVPI catalyst at the Decatur plant; it informed Amoco that it would be willing to work out a deal so that Amoco could use whatever catalyst it felt best; and Mobil considered (in house) offering Amoco a Teijin type deal. In light of all of the above and the entire record, the Court is persuaded that Mobil's aversion to licensing the right to manufacture ZSM–5 was not very strong.

e. *FACTOR 5:* The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

Amoco admits in paragraphs 20 and 21 of its Answer And Counterclaim that "Mobil and Amoco are direct competitors in the relevant market" and that "[t]here is an established, relevant market in the United States for the manufacture, sale, and use or licensing of the right to use, crystalline, molecular sieve compositions as catalysts for the process of xylene isomerization/ethylbenzene conversion." PX 2299. The reality of the situation, however, is that Amoco and Mobil were not truly competitors in the licensing of xylene isomerization technology, in the production and sale of PX or in the catalyst business.[18] This might have been different if

Mobil had not filed the present patent litigation because there is evidence in the record that this suit prevented Amoco from licensing or selling its AMSAC catalyst in competition with Mobil. Friedlander Tr. 2332; PX 2278. Yet, that did not happen and the Court is left with the fact that Amoco never sold, leased or licensed catalyst in competition with Mobil. Friedlander Tr. 2235–37; Evans Tr. 1194.

Moreover, at the time of the hypothetical negotiation, Amoco was the world's largest producer of PX, D.I. 240 at Exhibit J–2, and exactly the type of licensee Mobil was looking for.

f. *FACTOR 6:* The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

"Convoyed" or "derivative" sales occur where the sale of one thing is likely to cause the sale of another, such as selling a razor and then also being able to sell razor blades to go with it. Mobil argues that it should be entitled to look at the profits Amoco made by producing PTA because Amoco was an integrated manufacturer of PTA using all of the PX it produced during the period of infringement to make PTA.

The Court does not agree with Mobil. PTA is not a derivative or convoyed sale of PX because Mobil did not sell or license anything else (like razor blades) as a result of its licensing and leasing its MVPI technology. Likewise, Amoco did not sell anything other than PX as a result of its use of Mobil's patents. Friedlander Tr. 2266–68. In addition, the record contains sufficient evidence showing that Amoco's PX business and PTA business were separate. *See, e.g.,* DX 1940; Fligg Tr. 1466–68, 1471–74; Myers Tr. 1839–45.

---

17. The Court notes that Mobil has not produced any evidence as to the value it placed on the catalyst manufacturing rights it licensed to UOP, Chevron, W.R. Grace and Union Carbide.

18. Although Amoco and Mobil were competitors in the oil business, almost all of Mobil's MVPI licensees were also competitors in that respect. Green Tr. 2375; Smith Tr. 1279–80, 1391.

Furthermore, Dr. Dugan conceded that each and every one of the "benefits" he identified (both "quantified" and "unquantified") were only at the PX level and had nothing to do with PTA. Dugan Tr. 350–52. Thus, this factor is irrelevant in this case.

g. *FACTOR 7:* **The duration of the patents and the term of the license.**

The infringed patents issued and expired as follows:

(a) the '886 patent issued on November 14, 1972 and expired on November 14, 1989;

(b) the '857 patent issued on December 5, 1978 and expired on February 5, 1991; and

(c) the '872 patent issued on December 24, 1974 and expired on December 24, 1991. D.I. 240 at Exhibit J–2.

Amoco began using AMSAC catalyst at its Decatur No. 2 PX facility in May, 1980; at its Texas City No. 1 PX facility in April, 1983; and at its Texas City No. 2 PX facility in February 1984. D.I. 240 at Exhibit J–2. Infringement at all three facilities continued until December 24, 1991, the expiration date of the last to expire '872 patent.

The relevance of *Georgia–Pacific* Factor 7 is whether Amoco should pay royalties under the composition of matter patent only until its expiration or until the expiration of the last to expire of the two process patents. The Court has already found that Mobil cannot recover royalties on its '886 patent after its expiration in November of 1989. *See, supra,* Section B; *see also,* Smith Tr. 1396; Green, quoted at Smith Tr. 1398. Accordingly, Amoco must pay royalties for its infringement of the process patents from May of 1980 to December of 1991 and must pay royalties for its infringement of the composition of matter patent from May of 1980 to November of 1989.

h. *FACTOR 8:* **The established profitability of the product made under the patent; its commercial success; and its current popularity.**

The commercial success and popularity of Mobil's ZSM–5 based technology is without question and is described in the Court's liability opinion at 779 F.Supp. at 1478–79,

1482. Mobil's MVPI licensing/leasing program was very successful especially in its early years. After 1977, Mobil's success slowed. It encountered many rejections and was forced to grant concessions to several of its licensees.

Mobil asserts that Amoco's expected economic benefits from its infringement over the next best non-infringing alternative totalled 800 million dollars. For reasons explained, *infra,* discussion of *Georgia–Pacific,* Factor 11, the Court does not accept Mobil's argument. Amoco's estimation of its PX profits during the period of infringement is more reasonable. Amoco claims that during the entire period of infringement, from 1980 to 1991, it made a profit of approximately 360 million dollars from its PX operations and that almost half of that profit was made in the last three years, from 1989 to 1991. Fligg Tr. 1504. In addition, the Court notes that Mobil's profit on its MVPI license and leasing program is equal to Mobil's standard license and lease rates less its costs. Moreover, the total royalties and lease payments paid to Mobil by all of its other xylene isomerization licensees combined during the period of infringement is only approximately 200 million dollars. DX 1322; DX 1323; DX 1933; Smith Tr. 1403–04.

i. *FACTOR 9:* **The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

As of May, 1980, the alternative non-infringing xylene isomerization technologies available to Amoco were Isomar, Octafining and Amocofining. Schwartz Tr. 606. However, Isomar, Octafining and Amocofining did not provide the technical benefits of Mobil's patented xylene isomerization technology. 779 F.Supp. at 1439–40, 1478–83, 1495–96; Schwartz Tr. 608.

Amoco also found that Isomar and Amocofining were not comparable to Mobil's technology. By May, 1980, Amoco had evaluated UOP's Isomar technology and determined it was not as advantageous as other technologies available to Amoco. Friedlander Tr. 2336–37; PX 2663 (Slusar Dep.Tr. 34–35);

PX 2057. In 1980, Amoco also found that Amocofining is "no longer economical in use and does not represent a viable back-up position." PX 693.

Mobil's patented xylene isomerization technology provided increased production, higher PX yield and lower xylene losses. Schwartz Tr. 590; Amoco Admission No. 27 (PX 743). These technical advantages resulted in manufacturing cost savings to Amoco through increased production of PX relative to light and heavy aromatics by-products. Schwartz Tr. 590–91. In addition, Mobil's patented xylene isomerization technology consumes less hydrogen and is capable of operating at a lower hydrogen to hydrocarbon ratio. Schwartz Tr. 569–71; Amoco Admission No. 31 (PX 743). Amoco's hydrogen consumption using AMSAC was about ⅙th of that using Amocofining, Schwartz Tr. 571, resulting in manufacturing cost savings to Amoco through decreased raw material costs for hydrogen, decreased power consumption at the recycle gas compressor and decreased fuel consumption at the isomerization reactor furnace. Schwartz Tr. 575; PX 2225. By being able to alter the gas compressor, Amoco was able to reduce power requirements "something like 82 percent." Schwartz Tr. 576.

Mobil's patented xylene isomerization technology also provides greater catalytic activity, lower reaction temperature and greater temperature flexibility. Schwartz Tr. 578; Fligg Tr. 1633; Ely Tr. 2646; Amoco Admission Nos. 26 and 31 (PX 743). Octafining and Amocofining required reaction temperatures of about 800°F or greater. Schwartz Tr. 581–83. Mobil's patented technology enables operation over the range of from 600° to 800°F, resulting in manufacturing cost savings to Amoco through decreased fuel consumption at the isomerization reactor furnace. Schwartz Tr. 580–82; PX 2750.

Furthermore, Mobil's patented xylene isomerization technology provides higher space velocity and increased throughput. Schwartz Tr. 583. Amoco was able to "debottleneck" its PX units and increase its PX production capacity through its use of Mobil's patented xylene isomerization technology. Fligg Tr. 1589–90; Schwartz Tr. 584–85.

Mobil's patented xylene isomerization technology also provides better selectivity and more valuable by-products. Schwartz Tr. 585; Fligg Tr. 1631–33; Amoco Admission Nos. 26, 27, 31 (PX 743). Amoco's light aromatics by-products stream using Mobil's patented xylene isomerization technology contained a higher amount of valuable benzene (60%) than with Amocofining (7%). Schwartz Tr. 587, 611–13; PX 2759. Benzene is used in Amoco's production of styrene and is the most important light aromatics by-product to Amoco. Schwartz Tr. 586–87; Fligg Tr. 1632. The resulting cost savings to Amoco included higher PX content, higher by-product credits for benzene, decreased utility costs from "stacking" the towers and operating cost savings from by-passing the Ultraformer. Schwartz Tr. 586, 603–04, 611–13.

Moreover, Mobil's patented xylene isomerization technology functions without the need for a strong hydrogenation component, a naphthene pool or non-shape selective reactions which consume xylenes. Schwartz Tr. 588. Octafining and Amocofining require a strong hydrogenation component, i.e., platinum, to provide a naphthene pool. Amoco's infringing AMSAC catalysts function through a shape selective chemical mechanism and do not incorporate a strong hydrogenation component or use a naphthene pool. Schwartz Tr. 588. These technical advantages enabled Amoco to avoid the cost of carrying a platinum inventory. Schwartz Tr. 588–90; Fligg Tr. 1632; PX 2753.

The addition of molybdenum to a catalyst containing ZSM–5 for hydrocracking is expressly taught in Mobil's '886 catalyst composition patent. PX 1 (col. 5, lns. 3–5); Schwartz Tr. 594. Amoco's infringing AMSAC–1203M catalyst incorporates 3% molybdenum to hydrocrack paraffins and naphthenes contained in the fractionated Decatur No. 2 feedstock and produced a 22% increase in PX production at Decatur No. 2 resulting in PX manufacturing cost savings to Amoco. Schwartz Tr. 593–94; 596–97; PX 2750.

Additionally, Mobil's patented xylene isomerization technology provides longer catalyst

life, less catalyst coking and less frequent catalyst regeneration. Schwartz Tr. 597–98; Fligg Tr. 1632. The Octafining and Amocofining catalysts operate for only 1–1½ years and 2–3 years, respectively, whereas the AMSAC catalysts operate for approximately 8 years. Schwartz Tr. 599–600; PX 2760. The Octafining catalyst requires regeneration every 3 months and the Amocofining catalyst requires regeneration at least once a year, whereas the AMSAC catalysts require regeneration on average every 2 years. Schwartz Tr. 600–01; PX 2760. These technical advantages resulted in manufacturing cost savings to Amoco through decreased catalyst costs and increased production capacity for less down time. Schwartz Tr. 598–99. *But see infra* discussion of *Georgia–Pacific* Factor 13.

It is significant to note, however, that each of these benefits discussed above was known to Mobil before Mobil established its standard rates, Schwartz Tr. 632–33, and were incorporated in Mobil's quantification of the value of those benefits in its standard MVPI license and lease rates. Further, there is testimony that, in a case like this, where numerous licenses and leases had been entered into with substantial and sophisticated companies on both sides of the negotiation and with both sides agreeing that the terms are reasonable and fair, the market rates are the best evidence of the worth of the inventions. Friedlander Tr. 2283–84; Myers Tr. 1818.

**j. *FACTOR 10:* The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

The nature of the patented inventions is described in the Court's liability opinion at 779 F.Supp. at 1478, 1482. The character of the commercial embodiment of the invention is a process and catalyst for xylene isomerization.

Although most of Mobil's licensees/lessees used Mobil's standard catalysts (MVPI, MHTI and MLPI), Mobil did manufacture a custom catalyst for one of its VPI licensees,

Teijin, at a substantial reduction to Mobil's standard rates. Further, although each licensee's economic benefits varied, they all obtained the advantages of the technical benefits discussed above with respect to Factor 9. As also discussed above, Mobil carefully evaluated the benefits of its inventions before and after setting its MVPI rates and never increased its standard rates.

**k. *FACTOR 11:* The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

Amoco has made use of Mobil's inventions to produce approximately 18.59 billion pounds of PX. D.I. 240 at Exhibit I. Mobil argues that the massiveness of Amoco's infringement should result in an increased royalty rate. However, Amoco used Mobil's inventions in PX production, which was exactly the use for which Mobil licensed MVPI. As a large producer of PX, Amoco was the ideal candidate for a license because, the more PX it made, the greater Mobil's royalties. Mobil realized that its key to success was to increase the number of licensees and the amount of PX they produced since "[t]he royalty income derived from the MVPI license agreements is strictly dependent on the growth of the paraxylene/polyester market." DX 1347.1; DX 1433. Thus, Mobil sought to maximize its income by fostering an increase in PX production not by increasing PX royalty rates.

The parties wildly contest the evidence with respect to the value of Amoco's infringing use. For reasons already stated, Amoco asserts that an award pursuant to Mobil's standard MVPI license and lease rates would fully compensate Mobil for Amoco's infringement. Mobil, on the other hand, relies on the testimony of Dr. Dugan who found that Amoco's expected cost savings during the period of infringement by using AMSAC instead of the next best non-infringing alternative (Amocofining) was approximately 800 million dollars. Dugan Tr. 251; PX 2679. Moreover, Dr. Dugan testified that virtually all of that 800 million dollars in cost savings passed through to increase the profitability of PTA. Dugan Tr. 336–40.

Basically, to arrive at his 800 million dollar figure, Dr. Dugan added up four categories of benefits expected to arise from Amoco's infringement: (1) manufacturing cost savings; (2) plant construction savings; (3) platinum cost savings; and (4) ultraformer cost savings. PX 2351. Dr. Dugan quantified Amoco's manufacturing cost savings benefit as 488.39 million dollars. He arrived at this number by calculating the benefits of MVPI over Amocofining at each of Amoco's three plants, calculating the benefits of AMSAC over MVPI at each of the plants and then adding up the two sets of benefits. PX 2692.

Dr. Dugan also found that, in 1980, Amoco would have projected a need to build a new PX plant the size of Decatur No. 2 if forced to go back to Amocofining because by 1986 Amoco's PX demand would have exceeded its production capacity. Dugan Tr. 185–86, 190–91. Dr. Dugan quantified Amoco's avoidance of this new plant cost at 259.74 million dollars. Dugan Tr. 221, 231–32.

Dr. Dugan also found that Amoco would not have realized a 10.45 million dollar platinum cost savings if it had been required to use Amocofining. Dugan Tr. 235. After calculating the cost of carrying platinum as a capital asset, Dr. Dugan found that Amoco had saved 11.8 million dollars in platinum costs.

Finally, Dr. Dugan found that Mobil's technology allowed Amoco to bypass the Texas City Ultraformer, a benefit which was not possible using the Amocofining catalyst. Dugan Tr. 244–45. Dr. Dugan quantified the bypassing of the ultraformer at 39.95 million dollars. Dugan Tr. 250.

■■■■ The Court finds numerous flaws with Dr. Dugan's analysis. The first of which is that Mobil is judicially estopped from arguing that AMSAC increased Amoco's economic benefits at Texas City Nos. 1 and 2 over MVPI. In convincing this Court that Amoco was liable for infringement, Mobil itself argued that AMSAC gave no benefits over those conferred by MVPI:

The *operating results* achieved by Amoco in practicing its commercial xylene isomerization/ethylbenzene conversion process *are the same using AMSAC catalyst as they were with Mobil's leased MVPI ZSM-5 catalyst*. (DX 1641, Mobil Post–Trial Findings, p. 32; emphasis added).

\* \* \* \* \* \*

Fourth, Amoco says that AMSAC provides substantial *economic* advantages over MVPI at each of Amoco's plants. Any such advantages at Decatur are due to optimized AMSAC with molybdenum. ZSM–5 with molybdenum provides identical results (Schwartz Tr. 275–76; PX 1248). Amoco's own documents show that any *economic* advantage at Texas City is "largely due to the elimination of the Mobil royalty payment. (PX 1207 at AE006691; PX 1208 at AE 006669). Indeed, on an operating basis without regard to royalty, AMSAC had an economic disadvantage compared to MVPI at Texas City (DX 832, Attachment 8). (DX 1642; Mobil's Post–Trial Answering Memorandum; *see also* DX 1643).

Having earlier convinced the Court on this point, Mobil is judicially estopped from now arguing the contrary in support of its damages claim. "A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *Lewandowski v. National Railroad Passenger Corp.*, 882 F.2d 815, 818 (3d Cir.1989), *citing Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 512–13 (3d Cir.1953); *Samick Music Corp. v. Delaware Music Industries, Inc.*, 1992 WL 200882 (D.Del.1992). Moreover, the record supports the fact that there was no operating advantage of AMSAC over MVPI at Texas City Nos. 1 and 2 other than the savings of the MVPI license and lease fees.[19] Ely Tr. 2631–32; Dugan Tr. 403–04; PX 2225; PX 2764. Further, at Amoco's

---

19. Although Amoco admitted that AMSAC saved it approximately 15 million dollars yearly over MVPI, 12 million dollars of that was due to the improved performance at Decatur and, the 3 million dollar balance was attributable to not having to pay Mobil its standard catalyst lease charges. PX 2736 (Pohlmann Liability Tr. 2583–85).

Decatur No. 2 unit, AMSAC merely restored the *decrease* in original design capacity that Amoco had suffered when it had installed MVPI. Ely Tr. 2607. Mobil knew before it licensed Amoco that its MVPI catalyst performed poorly on unextracted feed of the type used at the Decatur No. 2 unit so it was not surprising that MVPI had an adverse effect on Decatur's original design capacity. Schwartz Tr. 646; DX 1511 at MB2300250–51. Mobil's MVPI licensee Idemitsu had suffered the same problem which resulted in royalty concessions being given to it by Mobil. Green Tr. 2392; Penick 902; DX 1601; DX 1610.

In addition, Dr. Dugan's analysis ignores the fact that MVPI was available to Amoco in 1980, as it was to all major PX producers, at Mobil's standard license and lease rates. For those standard rates, Amoco would have received all of the benefits of MVPI relative to Amocofining, including all of the ultraformer and platinum benefits.

Dr. Dugan also erroneously assumed that all of the 800 million dollars in expected cost savings benefits would go to the bottom line of PTA profitability. *See* Dugan Tr. 67. Mr. Fligg testified without contradiction that, because of the competitive nature of the PX business, "there's a very big difference between a cost reduction on a point in time analysis and what you would physically see in terms of margin improvement out over time, because ... you're going to find the cost reductions given away in the marketplace." Fligg Tr. 1496–97, 1617–18. It is not reasonable to assume that Amoco would share with Mobil "cost savings" that Amoco would be unable to take advantage of in the marketplace. In fact, Dr. Dugan admitted that he did not know whether Amoco actually *received* all of the "anticipated" benefits he calculated. Dugan Tr. 342–345.

Further, some of the calculations underlying Dr. Dugan's 800 million dollars in cost saving benefits calculations depend upon unsupported or erroneous assumptions. Specifically, Dr. Ely testified that the documents relied on by Dr. Dugan do not support his "benefits" analysis because:

(1) PX–691, on which Dr. Dugan principally relied, used COV's (corporate optimum values) which do not measure average savings, but only those on the last pound of PX produced, and cannot be prorated over the entire production. COV's are used only to improve plant performance over at most six months, and not for project evaluation. Ely Tr. 2628.

(2) PX–691 also includes as cost savings those resulting from capital expenditures made by Amoco, unrelated to the type of catalyst being used. The same is true of other documents relied upon by Dr. Dugan, in particular PX–2225 which Dr. Ely analyzed in detail, and which showed that at Amoco's Texas City No. 1 unit capacity was more than doubled while using Octafining or Amocofining catalysts, based solely on capital improvements. PX–2225 also showed that the switch from Amocofining to MVPI at Texas City No. 1 increased capacity only 2%. Ely Tr. 2576–2591.

In addition, even assuming that Dr. Dugan's "benefits" numbers were correct as of May, 1980, it was error for him to use them for the ensuing 11 years through 1991. The assumption that they would remain constant is not reasonable. For example, Dr. Ely testified that although the AMSAC 1203–M catalyst was originally developed for use at Amoco's Texas City No. 1 unit, within about five months prior to the date it was to be installed, the incentive for its use there went from a positive 0.2 cents per pound of PX to a *negative* 0.3 cents per pound—a difference of nearly one-half cent per pound. DX 1644; Ely Tr. 2622–24. The documents relied on by Dr. Dugan for his "benefits analysis" also demonstrate this point. For example, PX 2038 and PX 691, although dated only three weeks apart, show a 0.7 cent per pound difference in the purported uplift. PX 691; PX 2038; Ely Tr. 2625–26. Similarly, Mr. Penick testified that when someone "assumes that in one point in time when somebody says its 0.66 cents per pound as an advantage, that applies for the next six months", that is simply not a realistic assumption due to the "different values assigned to the various feedstocks and products, which change from time to time." Penick Tr. 807–08.

Moreover, the assumptions made by Dr. Dugan with respect to Amoco's cost savings

due to the lack of a need to build a new plant are speculative at best and unsupported by the evidence. Dr. Dugan could not point to a single Amoco document that suggested it would have built or was contemplating building an additional PX unit. Dugan Tr. 429. To the contrary, Amoco's Control Budget for 1980 (the critical time for the hypothetical negotiation) stated: "Because current marketing projections indicate that *no new paraxylene units* will be built in the near future, our efforts for 1980 will center on optimizing our existing units." DX 1778, emphasis added. The 1981 Control Budget was to the same effect. DX 1722.

Mobil argues that these control budgets are inapposite because they were written at a time when Amoco was using AMSAC and MVPI and did not anticipate returning to Amocofining. Notwithstanding, the Court disagrees with Dr. Dugan's conclusion. In the early 1980's, Amoco's existing PX units were operating at 40–60% of their capacity. Fligg Tr. 1538–39, 1599–1600; Ely Tr. 2633. In addition, the Decatur No. 1 plant had been closed in 1979 because its capacity was not needed. Its design was identical to Texas City No. 1 and through 1985 it could have been re-commissioned at minimal cost in one-month's time if its 400 million pound capacity was required. However, Amoco never had sufficient demand for PX to justify reopening the Decatur No. 1 unit. Ely Tr. 2565–67. Additionally, Dr. Dugan's numbers with respect to Decatur No. 2 were incorrect. The capacity of Decatur No. 2, which was designed for use with Amocofining, Ely Tr. 2568, was 860 million pounds per year, Ely Tr. 2606, and not the 550 million pounds per year as testified to by Dr. Dugan. Amoco's use of MVPI catalyst at Decatur actually decreased that unit's production by about 20%. Ely Tr. 2606. After switching to AMSAC, Amoco was able to return Decatur to its original design capacity. Ely Tr. 2674.

Moreover, the record reflects that Amoco could have increased its PX production,[20] regardless of which catalyst it used, through

equipment changes or additions at its existing PX units. Sims Tr. 2135; Ely Tr. 2579–83; PX 2225. Amoco did make capital improvements and, in fact, invested approximately 62 million dollars for such improvements during the period of infringement, most of which were unrelated to the catalyst used. Fligg Tr. 1528–29; Ely Tr. 2580–91, 2596–97, 2609–10, 2614–15, 2619; DX 1966.

Another alternative to building a new PX plant was Amoco's ability to purchase PX from others to fill all or a portion of its needs. Fligg Tr. 1469–71. If Mobil's royalty would have made it uneconomical for Amoco to produce PX, Amoco would have bought PX on the open market. Fligg Tr. 1490–91; *see also* Dugan Tr. 469 ("Amoco only makes PX because it is more economical to do so than to buy it on the open market."). The record reflects that throughout the period of infringement there were numerous PX producers actively seeking customers. Fligg Tr. 1473–74, 1545–46. Fligg Tr. 1546. Because the vast majority of U.S. PX producers had MVPI licenses with Mobil at its standard rates, they would have sold PX to Amoco at prices that reflected any cost advantages of MVPI. Fligg Tr. 1548. The feasibility of pursuing a purchase strategy was demonstrated by the success of the PTA and DMT producers, like DuPont and Eastman, who bought rather than made PX. Fligg Tr. 1548–49.

Most significantly, however, Dr. Dugan's expected benefits analysis does not pass the reality test. The hypothetically negotiated royalty must be reasonable—it must pass a reality test. *See, e.g., Hughes Tool Co. v. Dresser Indus.,* 816 F.2d 1549, 1558 (Fed. Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987); *Modine Mfg. v. the Allen Group,* 14 U.S.P.Q.2d 1210, 1989 WL 205782 (N.D.Cal.1989), *aff'd* 917 F.2d 538 (Fed.Cir.1990), *cert. denied,* 500 U.S. 918, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991); *see also* Smith Tr. 1402–03. Not surprisingly, in view of the foregoing problems, the 400 million dollar royalty resulting from Mobil's "bene-

---

**20.** The record does not establish how significantly Amoco could have increased its production by

capital expenditures.

fits" analysis fails this test. Friedlander Tr. 2247–52.

As previously noted, *Georgia–Pacific* factor 15 requires that, after paying the royalty, the licensee still is able "to make a reasonable profit." 318 F.Supp. at 1120. Mobil acknowledged that the data to determine the profitability of PX during the period of infringement was available, Smith Tr. 1400–02, but it never determined whether the 2.15 cents per pound royalty it seeks, or approximately 400 million dollars, leaves a profit to Amoco. As Mr. Fligg testified without contradiction, that royalty *exceeds* the entire profit Amoco made on PX during the period of infringement, approximately 360 million dollars. Fligg Tr. 1504. Dr. Dugan's analysis is unreasonable for this reason alone.

However, the "unreality" of the 400 million dollar royalty sought by Mobil, Dugan Tr. 264, is apparent from other evidence, as well.

- It is so far outside the range of royalties being charged for comparable xylene isomerization technology at the time as to be "up with the fluorescent lights." Friedlander Tr. 2248–52; DX 1800–G1; DX 1800–G2.

- It is about 8 times greater than the established royalty rates for the MVPI process and catalyst.

- It is almost twice as much as the approximate $200 million in royalties and lease payments paid to Mobil *by all other xylene isomerization licensees* (MVPI, MHTI, MLPI) *combined* during the period of infringement. DX 1322; DX 1323; DX 1933; Smith Tr. 1403–04.

- It even exceeds the total of royalties and lease payments (369 million dollars) to Mobil, from 1976–1989, by *all* other ZSM–5 licensees, for *all* of the 9 processes (xylene isomerization, styrene manufacture, toluene disproportionation, selective toluene disproportionation, para-methylstyrene manufacture, distillate dewaxing, lube dewaxing, fluid catalytic cracking, methanol to gasoline) for which Mobil licensed that technology. PX 1251; PX 1253; Green Liability Tr. 818–29.

Accordingly, the Court finds that Dr. Dugan's expected benefits analysis is unsound.

l. *FACTOR 12:* **The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

Mobil's general licensing policy has already been discussed with respect to *Georgia–Pacific* Factor 4. Mobil produced evidence that: (1) the "rule of thumb" in the industry is to charge 15% to 40% of the licensee benefits as a royalty where there are business uncertainties, Evans Tr. 1123; (2) the 25% royalty for the MVPI process license was within the custom of the industry and reasonable, Friedlander Tr. 2352, 2349–50; (3) the 37% of the assumed economic benefits to the licensee that Mobil charged for its MVPI license and lease program was a "customary profit", Smith Tr. 1304–05; (4) it is not unusual for a licensor in the industry to ask for half of the licensee's economic benefits as a royalty, Friedlander Tr. 2352; and (5) 50% of the licensee's benefits as a royalty is reasonable where there are no business uncertainties, *i.e.* the licensee has had experience with the process, the economic benefits are defined, the character of the technology is proven and the patent is determined to be valid, Evans Tr. 1123–24, 1130–31.

Amoco, on the other hand, produced evidence that: (1) Mobil recognized that all successful licensors follow the principle that the licensee is entitled to the "lion's share" of the economic benefits while the licensor should take only a minor ("lamb's") share, DX 1300–R; (2) Mobil's target in setting royalties for its ZSM–5 processes was to obtain approximately 20% of the uplift over alternative technology, DX 1454 at MB2012571; DX 1455 at MB2012630; DX 1543 at M1192204; DX 1839; (3) Amoco's actual royalty rate for the MVPI process license was 16.9%, not 25%, because of the tiered royalty structure in the standard license, Sims Tr. 2108–09; DX 1800–C1; (4) the "rule of thumb" testified to by Mr. Evans is also known as the "25–percent rule", Evans Tr. 1128; (5) the evidence under *Geor-*

*gia–Pacific* Factor 2 regarding a comparison of the rates charged for other xylene isomerization processes and catalysts is applicable to Factor 12 as well, Friedlander Tr. 2285; and (6) Mr. Smith's opinion that the parties should split the benefits 50/50 is without analysis, unsupported and the same opinion he gave in several other patent damages cases when testifying for the plaintiff, despite dramatic factual differences between those cases and the present case.

Mobil's 50% figure is unrealistic in light of Mobil's actual MVPI licensing conduct. In addition, as already discussed, the Court finds Mobil's claim that its standard catalyst lease rates were set to obtain an additional 12% of the technological advantage of MVPI to be unsupported. The evidence shows that Mobil sought to take advantage of the increased benefits of MVPI only in its process license rates, permitting the catalyst lease rates to be set at a rate cost neutral to competing technology. Huggett Tr. 1787; Evans Tr. 1152, 1155; Green 2365–66, 2369. Accordingly, the Court cannot agree with Mobil's 37% figure.

m. **FACTOR 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

The record indicates that Amoco spent approximately 5 million dollars in developing AMSAC and obtained its own patent on its AMSAC catalyst. Friedlander Tr. 2286. To the limited extent that AMSAC performed better than MVPI, it was because of improvements *made* by Amoco. Yet the greatest of the improvements, the addition of molybdenum, was taught in Mobil's patents.

Mobil contends that all of the 800 million dollars in expected benefits quantified by Dr. Dugan were attributable solely to Mobil's inventions. While the Court has problems with much of Dr. Dugan's analysis, the Court accepts this statement with one qualification. Some of Dr. Dugan's calculations included improvements made by Amoco to its PX plants which increased capacity and cost savings and were independent of the catalyst changes. PX 2225; Ely Tr. 2580–91.

Mobil's conduct in other situations is relevant to the question of profits to which Mobil is entitled, although not decisive, because of obvious factual differences. For example, the Court notes that when confronted with Teijin's improvements to Mobil's MVPI catalyst, Mobil did not charge Teijin more than its standard rates but rather gave Teijin substantial concessions. Friedlander Tr. 2286–88. In addition, when Idemitsu had problems with Mobil's MVPI catalyst due to unextracted feed, Green Tr. 2392; Penick Tr. 902, similar to the problems Amoco had at Decatur, Evans Tr. 1177, Mobil permitted Idemitsu to use Mobil's new and improved MHTI catalyst at its standard MVPI rates.

n. **FACTOR 14: The opinion testimony of qualified experts.**

In determining the weight accorded to each expert's testimony, the Court looked not only at the demeanor, credibility and qualifications of the expert but also at the factual basis for the expert's testimony. For example, because the Court found several flaws in Dr. Dugan's expected benefit analysis, the opinions of the experts given in reliance on Dr. Dugan's report and testimony were discounted accordingly by the Court.

o. **FACTOR 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee— who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

The fifteenth factor sets forth the "willing-buyer—willing seller" hypothetical negotiation framework through which the other

fourteen factors are to be considered. After examining each of the fourteen other factors and the entire record in this case, the Court finds that the parties, after engaging in a hypothetical negotiation in May of 1980, would have agreed to a license of the rights infringed by Amoco in this case at a royalty rate equal to Mobil's standard MVPI license and lease rates.

The Court finds highly significant the overwhelming evidence of Mobil's standard rates. Mobil knew all of the technical benefits of its MVPI technology before it began its license and lease program and had studied the economic benefits as well. Although the evidence shows that those economic benefits greatly increased over time, Mobil and its licensees expected this and, most importantly, Mobil still chose not to increase its standard rates. In fact, Mobil's standard rates remained the same from the time they were set in 1974–1975 until at least 1988.

The Court also finds that an award pursuant to Mobil's standard MVPI license rate clearly compensates Mobil for Amoco's infringement of its process patents. Moreover, as already explained, the Court finds that the value of Mobil's composition of matter patent was fully encompassed in Mobil's standard catalyst lease rates. Even Mobil was unable to point to any damages it suffered beyond the loss of the lease payments due to Amoco's infringement of the composition of matter patent. In that respect, the Court significantly credited Professor Myers' testimony that where you have market rates for something, like the standard MVPI technology rates, those rates are the best evidence of the result of a hypothetical negotiation because those rates distill all of the quantitative and qualitative factors that would affect the parties to the negotiation. Myers Tr. 1815, 1830–31.

In determining the value to Mobil of the rights infringed by Amoco, the Court also weighed very heavily Mobil's conduct with regard to the concessions given to several of its other licensees. These concessions are important in two different ways. First, the fact that Mobil willingly granted significant concessions to every xylene isomerization licensee that requested such concessions shows that Mobil, as well as its licensees, recognized that the value of Mobil's technology was less than its standard rates. This conclusion is further demonstrated by the numerous rejections Mobil suffered with respect to its MVPI technology.

Second, two of the concessions granted by Mobil are particularly significant because they are factually the most similar to the situation between Mobil and Amoco and therefore demonstrate Mobil's probable course of conduct in a hypothetical negotiation. When faced with the discovery that one of its licensee's, Teijin, had most likely violated Mobil's policy against analyzing ZSM–5 catalyst samples and developed its own custom catalysts, Mobil did not attempt to raise Teijin's rates but rather granted Teijin significant concessions amounting to a 63.6% reduction in Mobil's standard MVPI rates for the first custom catalyst (DEIP) and a 47.8% reduction for the second custom catalyst (BDEIP). In addition, when Idemitsu, one of Mobil's MVPI licensees, was experiencing problems with the MVPI catalyst at a facility using unextracted feed similar to the problems suffered by Amoco at its Decatur No. 2 facility, Mobil gave Idemitsu its new MHTI catalyst at its lower standard MVPI rates, a 34.3% reduction from Mobil's MHTI rates, and did not charge Idemitsu the $4.00 per pound catalyst loading charge required under the standard MHTI lease.[21]

The Court also finds that the parties' conduct in their actual negotiations is relevant to what their conduct would be in the hypothetical negotiation. As already stated, Mobil clearly wanted to keep Amoco, the world's largest PX producer, as its licensee. Through the parties' negotiations, Mobil wanted to convince Amoco that it was "infringing Mobil's catalysts and ought to go back to an arrangement with Mobil to become a licensee again." Huggett Tr. 1758–59. In an effort to resolve the problem with Amoco, Mr. Penick agreed with Mr. Huggett that Mobil and Amoco should come to an agreement whereby Amoco could "legally use

---

**21.** As already stated, the Court is more than aware of the factual differences between Amoco's infringement and the situations involving Teijin and Idemitsu.

whatever catalyst it feels is best suited for its purposes." DX 1373; Penick Tr. 926–28. This would have included allowing Amoco to use its AMSAC catalyst at the Decatur No. 2 plant. Although never offered to Amoco in actual negotiations, an internal Mobil document contemplated that "[t]he royalty obligation may not be a problem for Amoco so long as they do not have to pay the lease fees for MCIL's catalyst. However, we might offer a reduced royalty as added incentive." DX 1374; Huggett Tr. 1771–72. In short, Mobil contemplated a deal very similar to what it had done with Teijin, reduced royalty rates and reduced (or eliminated) lease fees for Amoco's custom AMSAC catalyst. Mobil's documents further indicated that it considered leasing the non-infringing binder to Amoco and permitting "Amoco to have [the] finished [infringing] catalyst prepared" by a third party. DX 1567. Although Mobil never in fact made such offers to Amoco, the Court finds that Mobil would have been likely to offer something similar had the negotiations not broken off due to Amoco's belief that its conduct was not infringing. Fagan Tr. 2511; DX 1373. Thus, the Court concludes that the overwhelming evidence in this case indicates that in a hypothetical negotiation with Amoco, Mobil would have been unlikely to insist on rates above its standard MVPI rates and Amoco would have been unwilling to pay a royalty above those standard rates.

For reasons already stated, the Court does not believe that Dr. Dugan's "expected benefit" analysis accurately quantifies the benefits of Mobil's technology over the next best non-infringing alternative to Amoco. Among other things, the Court could not have awarded damages based upon Dr. Dugan's 2.15 cents per pound royalty rate because that rate defies reality. As already explained, Amoco's damages pursuant to that rate (400 million dollars) would exceed the total royalties and lease payments to Mobil from 1976 to 1989 by all of the other ZSM–5 licensees for all of the nine processes for which Mobil licensed ZSM–5 (369 million dollars) and would have been almost double the royalties and lease payments to Mobil by all of its xylene isomerization licensees combined during the entire period of infringement (200 million dollars).

Additionally, Mobil's assertions that its bargaining position would have been stronger than Amoco's because at the hypothetical negotiation its patents were deemed valid, its technology proven and the benefits known, ignores the reality that Amoco could not take a license at any rate higher than the open market price of PX. In fact, Amoco would only have taken a license from Mobil if the license royalties together with the cost of manufacturing PX was less than the cost of PX in the open market. The fact that Mobil had licensed the vast majority of PX producers in the United States at its standard MVPI rates (and had even given some of them concessions) would have ensured that the market price for PX would have been less than Amoco's manufacturing and royalty costs if the royalty significantly exceeded Mobil's standard rates.

Accordingly, after careful study of the entire record in this case and for all of the reasons stated herein, the Court finds that if Mobil and Amoco had engaged in hypothetical negotiations in May of 1980 to determine the appropriate rate of a patent license for all of the rights that Amoco has been held to infringe, the parties would have settled on a royalty equal to Mobil's established license and lease rates.

## G. PREJUDGMENT INTEREST

Both parties agree that Mobil is entitled to prejudgment interest on its damages award compounded quarterly from the date of infringement to the date of judgment. D.I. 240 at J–2, ¶ 27. The parties, however, disagree as to the appropriate rate of interest. Mobil claims that the prime rate is the appropriate rate because it would fully compensate Mobil for the time value of its money while precluding a windfall to Amoco. Amoco, on the other hand, contends that the 30–day Treasury bill rate should be used because it represents the truest measure of the time value of money without including compensation for risk.

### 1. *STANDARDS*

The Supreme Court has held that prejudgment interest should be awarded in most patent cases because prejudgment interest is necessary to fully compensate the patent owner. *General Motors v. Devex*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). Specifically, the Court stated that an award of prejudgment interest:

> is necessary to ensure that the patent owner is placed in as good a position as he [or she] would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his [or her] damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment.

*Id.* at 655–56, 103 S.Ct. at 2062. Thus, the purpose of awarding prejudgment interest is to compensate the patent owner for the time value of money and the Court must determine which rate of interest will best accomplish that purpose in this case.

The Federal Circuit has given district courts great discretion in determining the interest rate for awards of prejudgment interest. *See, e.g., Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 939 F.2d 1540, 1545 (Fed.Cir. 1991); *Bio–Rad Lab. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986) ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). This broad discretion permits a district court to select an interest rate ranging from the 30–day Treasury bill rate to the prime rate and even beyond. *See, e.g., Uniroyal*, 939 F.2d at 1545 ("A trial court is afforded wide latitude in the selection of interest rates ... and may award interest at or above the prime rate."); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus.*, 862 F.2d 1564, 1579–80 (Fed.Cir.1988); *National Presto Indus., Inc. v. Black & Decker, Inc.*, No. 89 C 8978, 1992 WL 125559 at *8 (N.D.Ill. 1992) (awarded Treasury bill rate). The Federal Circuit has made it clear that a patentee need not "demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal*, 939 F.2d at 1545 (citing *Studiengesellschaft*, 862 F.2d at 1579–80); *cf. Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, (Fed.Cir.1990) (district court should not be required to "consider and determine what use the patentee would have made of the royalty payments it should have received").

### 2. *MOBIL'S ARGUMENTS*

Mobil argues that it would have used the royalty payments from Amoco to pay down its worldwide short term debt and because the weighted average of the interest on that debt from 1980 to 1993 was greater than the prime rate, an award of the prime rate is necessary to fully compensate it. Dugan Tr. 300. Mobil also points out that awarding prejudgment interest at the 30–day Treasury bill rate would give Amoco a windfall and encourage others to infringe because Amoco would have effectively obtained a forced thirteen year loan at a rate it would have been unable to obtain in any other manner.

### 3. *AMOCO'S ARGUMENTS*

Amoco argues that Dr. Dugan's conclusion, that the average rate of Mobil's weighted worldwide short term borrowings from 1980 to 1993 was above the prime rate, is flawed. Amoco criticizes Dr. Dugan's analysis because Dr. Dugan averaged interest rates quoted in different currencies. Amoco's economic expert, Professor Myers, testified that because of inflation and exchange rate fluctuations, Dr. Dugan's method does not provide a meaningful measure of the true cost of Mobil's borrowing. Further, Amoco claims that there is no way to know if Mobil would, in fact, have applied the royalty payments from Amoco to its short term debt as opposed to any other business cost. In addition, Amoco points to evidence which suggests that Mobil's policy to pay down its debt arose in 1984 and did not extend beyond 1989. Finally, Amoco points to Professor Myers' testimony that: "The prime rate is just plain the wrong choice for large corporations. Large corporations don't borrow at the prime rate assuming they are credit worthy and haven't for at least a decade, actual-

ly, at least fifteen years." Myers Tr. 1864; see also Siegel Tr. 551–52; Dugan Tr. at 480.

## 4. FINDINGS AND CONCLUSIONS

 Based upon a review of the law and the entire record, the Court concludes that an award of prejudgment interest at the prime rate is necessary to make Mobil whole and to ensure that Mobil is placed in as good a position as it would have been in had Amoco not infringed.

The prime rate is an interest rate on short term debt. Dugan Tr. 285; Myers Tr. 2009; Siegel Tr. 529–30. Short term debt is generally recognized as debt that is for less than a year. Siegel Tr. 529. The Federal Reserve Bulletin sets the prime rate by quarter. Dugan Tr. 285–86; PX 2701; PX 2554.

Mobil established that its worldwide average short term borrowing rate during the period of 1980 to 1993 was at least the prime rate. Siegel Tr. 543–45; Dugan Tr. 298. While the Court was intrigued by Professor Myers' testimony that the averaging of foreign interest rates does not provide a true picture of Mobil's short term cost of borrowing, even Professor Myers admitted that Mobil had followed generally accepted accounting principles in arriving at this average rate.[22] Myers Tr. 2008–10.

The Court also finds that during much of the relevant time period, Mobil had a strong corporate policy of paying down debt. In 1984, Mobil acquired Superior Oil and "paid through the nose for a lot of bank borrowings" because Mobil essentially doubled its debt load from approximately 6–7 billion dollars to 13 billion dollars. Siegel Tr. 536. The acquisition of Superior Oil was financed using about ⅔ short term debt and ⅓ long

term debt. Siegel Tr. 539–40. Initially, all of Mobil's short term borrowings for the acquisition of Superior Oil were in the United States at a rate of at least prime. Siegel Tr. 541. Mr. Siegel testified that Mobil could not obtain short term borrowings at less than the prime rate because it borrowed so much money at a single moment in time. Siegel Tr. 543. Although Professor Myers testified that virtually all of Mobil's Superior Oil debt was financed as long term debt, Myers Tr. 1863, the Court finds the testimony of Mr. Siegel to be more credible because Mr. Siegel, the former Mobil Oil Manager of Investments and Planning in Corporate Treasuries, had responsibility for the day-to-day banking in the United States during the period at issue and had first hand knowledge of the transactions involved.[23]

As a result of Mobil's addition of 6–7 billion dollars in debt in 1984, Mobil's borrowing costs increased. Siegel Tr. 536; Myers Tr. 2049–50. Mobil's credit rating was downgraded from AAA to AA. Siegel Tr. 536–37; PX 2431—PX 2432. Moreover, the relatively high debt to equity ratio that resulted from Mobil's acquisition of Superior Oil was a burden that resulted in decreased financial flexibility. Dugan Tr. 291–92.

Mobil was uncomfortable with the high level of debt it acquired in the mid–1980's, Dugan Tr. 289, and vigorously pursued a policy to retire debt until 1988 or 1989. Dugan Tr. 288; PX 2433; see also Myers Tr. 1863 (Mobil's debt reduction policy existed from 1984 to 1989). As Mr. Siegel testified, the paying down of short term debt during the mid-to-late 1980's "was more than a corporate finance policy, it was a management dictum." Siegel Tr. 540. Mobil vigorously

22. The Court believes that Professor Myers' arguments make a great deal of sense. Mobil generally has more short term borrowings outside the United States than inside the United States and, therefore, Mobil's high overall short-term borrowing rates are due to the influence of the foreign borrowings. Siegel Tr. 543, 550. In fact, Mr. Siegel testified that at the present time Mobil is not borrowing at prime rate in the United States, although it does have long term borrowings in the United States at rates exceeding the prime rate. Siegel Tr. 550.

Even were the Court to agree with Professor Myers and find that the weighted average of

Mobil's short term borrowings over the relevant period was an improper measure to compare against the prime interest rate in the United States, in light of the other evidence in this case, the Court would still find that the rate necessary to fully compensate Mobil for the loss of the royalty payments over time is the prime rate.

23. However, the Court notes that Professor Myers' testimony does not necessarily contradict the testimony of Mr. Siegel because Mobil could have converted its original short term debt into long term debt.

pursued a strategy and commitment to pay down its debt and lower its debt to equity ratio to achieve greater financial flexibility, Dugan Tr. 290, 292, and to regain its AAA credit rating. Dugan Tr. 293–94. Mobil's annual reports in that time period "place a very great emphasis on paying down debt." Siegel Tr. 541; PX 2720; PX 2433–39. In pursuit of that policy, Mobil sold its interest in Montgomery Ward. Dugan Tr. 290; Myers Tr. 2053.

Dr. Dugan testified that short term debt is the most obvious opportunity to pay down debt. Dugan Tr. 285. Thus, if Mobil had received surplus money in the form of quarterly royalty payments from Amoco during the 1980's that was not needed for operations or capital projects, Mobil would have been likely to use that money to pay down its worldwide short term debt and would have saved the interest on that debt, the average of which was at least prime. Siegel Tr. 532, 544–45; Dugan Tr. 298.

Of course, the Court recognizes that there is no way to predict with certainty what amount of Amoco's royalties, if any, that Mobil would have used to pay down its debt. *See* Siegel Tr. 532–33 (Mobil's incoming cash is not earmarked for particular purpose); Myers Tr. 1862 (it is impossible to track particular dollars that go into Mobil's bank account and conclude that they were used for particular purpose). It is likely, however, that a portion of those royalties would have been used to pay down short term debt in light of Mobil's strong policy of paying down debt during this period. Moreover, Amoco, as the infringer, should bear any risks of uncertainty or inability to predict the flow of dollars through Mobil. *See, e.g., Kori Corp.,* 761 F.2d at 655 ("Fundamental principles of justice require us to throw any risk of uncertainty [in calculating lost profits] upon the wrongdoer rather than upon the injured party."). Hence, the Court concludes that an award of prejudgment interest at the prime rate comes closer to Mobil's actual cost of borrowing during the 1980's and to placing Mobil in as good a position at it would have been had it received quarterly royalty payments from Amoco than the 30–day T-bill rate.[24] Siegel Tr. 545; Dugan Tr. 300.

Similarly, fundamental principles of justice require that in fixing damages in a patent infringement action, all doubts should be resolved in favor of the patentee and against the infringer. Thus, in the present case, as between Amoco, the infringer, and Mobil, the patentee, Amoco must bear any risk of uncertainty as to damages, including any risk regarding the appropriate rate for prejudgment interest. Accordingly, the Court finds that the appropriate rate for prejudgment interest is the prime rate because that rate best compensates Mobil for the loss of the use of Amoco's royalty payments over time.

The parties are to submit an order, with supporting calculations at the prime interest

---

24. Amoco makes much of the testimony of Professor Myers who stated that the 30–day Treasury bill rate is the most appropriate rate because it compensates only for the time value of money and does not contain any mark-up for risk. The Court questions this conclusion. Although not addressed by either party, the Court notes that the Seventh Circuit has suggested that all district court judges "use the prime rate for fixing prejudgment interest where there is no statutory interest rate." *Gorenstein Enter. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989). In making that suggestion, the Seventh Circuit reasoned that:

[The prime rate] is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default. The defendant who has violated the plaintiff's rights is in effect a debtor of the plaintiff until the judgment is entered and paid or otherwise collected. At any time before actual payment or collection of the judgment the defendant may default and the plaintiff may come up empty-handed. The plaintiff is an unsecured, uninsured creditor, and the risk of default must be considered in deciding what a compensatory rate of interest would be. *Id.* at 436. The Seventh Circuit went on to note that the 52–week Treasury bill rate was too low because it does not compensate for this risk of default. *Id.* at 437 (Treasury bill rate is too low because "there is no default risk with Treasury bills.").

The Court finds that the present case is analogous. Until the judgment against Amoco is paid or otherwise collected, Amoco is a debtor to Mobil. Thus, Mobil runs the risk, however slight, that Amoco will default and Mobil will be unable to collect on the judgment. Considering that the present judgment is not completely risk free to Mobil, the use of the prime rate is reasonable.

rate compounded quarterly, setting forth the final amount of Mobil's damages award. The parties are to apply the prime rate in effect as of the first day of a quarter to the cash flow earned in that quarter.

## H. ATTORNEYS' FEES

Having already held that this case is not "exceptional" under 35 U.S.C. § 285, the Court is precluded from providing Mobil with an award of its attorney's fees.

## I. FINAL CALCULATION OF MOBIL'S DAMAGES

The calculation of Mobil's damages is made by multiplying the appropriate royalty rates by the infringing quantities. Prejudgment interest is then calculated and added. Myers Tr. 1806–13, DX 1790. As found above, the appropriate rates are Mobil's standard MVPI license and lease rates.

Mobil's expert, Dr. Dugan (without agreeing that they were appropriate), and Amoco's expert, Professor Myers, both calculated Mobil's damages using Mobil's established rates. Dr. Dugan calculated damages of $31,736,366 under Mobil's established license rates and damages of $20,893,625 under Mobil's established lease rates for a total of $52,629,991 before adding prejudgment interest. PX 2351, Tables N and O. Professor Myers calculated Mobil's damages to be $30,828,644 under Mobil's established license rates and $16,259,542 under its established lease rates for a total before prejudgment interest of $47,088,186. DX 1800–A1; DX 1800–B1; DX 1791.1.

Dr. Dugan and Professor Myers, in addition to using the same rates from Mobil's standard MVPI license and lease, also multiplied those rates by the same quantities. It was stipulated that the quantity of PX produced during the period of infringement was 18.59 billion pounds, PX 2354, and the number of pounds of catalyst used was 45,000 at Texas City No. 1, 55,600 at Texas City No. 2 and 105,000 at Decatur. DX 1800–B2. Nevertheless, as noted above, their calculations

differed by $5,541,805. There are two reasons why Dr. Dugan's and Professor Myers' calculation of damages using the same established rates and same quantities resulted in this difference.

First, Dr. Dugan calculated damages for infringement of the composition patent through the end of 1991 by extending lease payments through that year even though that patent expired on November 14, 1989. Professor Myers did not include damages beyond the expiration of the '886 patent. Sims Tr. 2141–42. As explained earlier, *supra* Section B, the Court finds as a matter of law that Mobil is not entitled to damages for infringement of its composition patent beyond the expiration date of that patent. Thus, the Court accepts Professor Myers' calculation with respect to the catalyst lease and finds that Mobil is entitled to $16,259,542 before prejudgment interest for Amoco's manufacture and use of the AMSAC catalyst. The Court further finds that Professor Myers' calculation of Mobil's pre-interest damages using the established lease rates and agreed upon quantities is in accordance with the applicable law and Mobil's licensing practices.

Second, Dr. Dugan did not take into account the PX produced under Amoco's continuing licenses with Mobil at Texas City Nos. 1 and 2, after infringement began at Decatur No. 2. Sims Tr. 2138–39. Professor Myers, on the other hand, did count Amoco's non-infringing PX production.

In 1980, Amoco began producing PX at its Decatur plant using the infringing AMSAC catalyst. PX 2354. However, until 1983 and 1984, Amoco continued producing PX at its Texas City No. 1 and No. 2 plants using Mobil's MVPI catalyst and paying royalties on that production in accordance with the established rates in its MVPI license and lease agreements with Mobil. Under Mobil's standard MVPI license, the production of *all* of a licensee's PX units was aggregated for the purpose of applying the tiered royalty schedule.[25] Green Tr. 2376–77. By not tak-

---

25. Schedule A of that standard MVPI license agreement calls for a royalty of 0.25 cents per pound for the first 200 million pounds produced per year, a royalty of 0.20 cents per pound for the next 300 million pounds and a royalty of 0.15

ing into account Amoco's Texas City licensed (non-infringing) production, Dr. Dugan's calculations resulted in Amoco paying the highest 0.25 cents per pound rate for the first 200 million pounds of Amoco's infringing production using AMSAC from 1980 through 1984 at Decatur while, at the same time, Amoco was also paying at that highest tier for the first 200 million pounds of PX produced at Texas City. Sims Tr. 2139. Professor Myers, however, added up all of Amoco's PX production, infringing and non-infringing, for the years at issue and then applied Mobil's standard rates.

The Court finds that Dr. Dugan's calculation is correct and in accordance with Mobil's established rates. When Amoco repudiated its MVPI license and began infringing Mobil's patents, it also repudiated its right to have any infringing PX production counted in the tiered royalty schedule along with its non-infringing production. Thus, Mobil's damages for all of Amoco's infringing PX production shall be determined according to Mobil's established rates under the tiered royalty schedules but exempting Amoco's non-infringing PX production. The Court accepts Dr. Dugan's pre-interest calculation of Mobil's damages at the established MVPI license rates of $31,736,366. PX 2351, Table N. The Court further finds that Dr. Dugan's calculation of Mobil's pre-interest damages using the established license rates and agreed upon quantities is in accordance with the applicable law and Mobil's licensing practices.

To arrive at Mobil's total pre-interest damages award, the Court adds the damages under the established license rates, $31,736,366, to the damages under the established lease rates, $16,259,542, for a total of $47,995,908. Thus, Mobil's damages before prejudgment interest are found by the Court to be $47,995,908.

## VI. *CONCLUSION*

For the reasons stated above, the Court finds that Amoco must pay to Mobil $47,995,908 in damages for its infringement of Mobil's '886, '857 and '872 patents. In addition, Amoco is required to pay Mobil prejudgment interest on the award compounded quarterly at the prime rate.

## ORDER ON MOTION TO ALTER OR AMEND

1. On September 29, 1994, this Court issued its Opinion relative to the damages phase of this action for patent infringement. [Docket Item ("D.I." 278) ]. On October 14, 1994, Plaintiff Mobil Oil Corporation ["Mobil"] filed a Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e) and/or for Relief from the Judgment because of mistake under Federal Rule of Civil Procedure 60(b)(1). (D.I. 280). The Motion has now been fully briefed by the parties.

2. Mobil's motion relates generally to the damages awarded by the Court for Amoco's infringement of Mobil's composition of matter patent. In determining the appropriate amount of damages to compensate Mobil for Amoco's patent infringement, this Court, in its Opinion of September 29, 1994, separated the rights infringed by Amoco into two parts: 1) process patent rights, and 2) composition of matter patent rights. *Mobil Oil Corp. v. Amoco Chemicals Corp.*, Civil Action No. 83–207–LON, Slip op. at 12, 1994 WL 657913 (D.Del. September 29, 1994). With regard to the process patent rights, the Court found that Mobil had an established royalty rate for its VPI process patents. Under Schedule A of Mobil's standard VPI process license, the licensee was to pay Mobil: 0.25 cents per pound for the first 200 million pounds of paraxylene ("PX") produced each year; 0.20 cents per pound for the next 300 million pounds; and 0.15 cents per pound for any PX produced beyond 500 million pounds. (D.I. 278 at 20).

3. In calculating the damages due for Amoco's infringement of the process patent rights, the Court accepted the calculations of Mobil's expert, Dr. Dugan. Dr. Dugan arrived at his calculations against the following background. During the relevant time period, Amoco manufactured PX at four separate facilities: two located in Decatur, Alabama (the Decatur No. 1 and No. 2 units) and two

cents per pound for anything over 500 million pounds.

located in Texas City, Texas (the Texas City No. 1 and No. 2 plants). (D.I. 278 at 3). In 1980, Amoco began producing PX at its Decatur plant using the infringing AMSAC catalyst. (D.I. 278 at 100). However, at its Texas City No. 1 and No. 2 plants, Amoco continued producing PX using Mobil's MVPI catalyst and paying royalties on that production in accordance with the established rates in its MVPI license and lease agreements with Mobil until 1983 and 1984. Thus, Amoco began infringing at Decatur in 1980, but did not begin infringing at Texas City until 1983 and 1984. As the Court noted in its September 29th Opinion, under Mobil's standard MVPI license, the production of all of a licensee's PX units was aggregated for the purpose of applying the tiered royalty schedule. Nevertheless, in calculating damages for Amoco's infringement of Mobil's process rights at the Decatur plant from 1980 to 1984, Dr. Dugan appropriately did not take into account Amoco's Texas City licensed (non-infringing) PX production. By not taking into account Amoco's Texas City non-infringing production, Dr. Dugan's calculations resulted in Amoco paying the highest 0.25 cents per pound rate for the first 200 million pounds of Amoco's infringing production using AMSAC from 1980 through 1984 at Decatur while, at the same time, Amoco was also paying at the highest tier for the first 200 million pounds of PX produced at Texas City. The Court found that the approach of Mobil's Dr. Dugan was the appropriate one, stating that "[w]hen Amoco repudiated its MVPI license and began infringing Mobil's patents, it also repudiated its right to have any infringing PX production counted in the tiered royalty schedule along with its non-infringing production." (D.I. 278 at 100–01). Thus, the Court concluded that "Mobil's damages for all of Amoco's infringing PX production shall be determined according to Mobil's established rates under the tiered royalty schedules *but exempting Amoco's non-infringing PX production.*" (D.I. 278 at 101) (emphasis added).

4. With regard to the second type of patent rights infringed by Amoco, the Court found that Mobil did not have an established royalty rate for Amoco's infringing manufacture and use of AMSAC catalyst. (D.I. 278 at 35). Accordingly, the Court found that the appropriate measure of damages for Amoco's infringement of Mobil's composition of matter patent was the lost profits caused by the infringement. (D.I. 278 at 39). In making a reasonable approximation of Mobil's lost profits, the Court concluded that the lease payments which Mobil would have received from Amoco represented such a reasonable approximation. Under Mobil's standard MVPI catalyst lease, the lessee was to pay Mobil: $3.00 per pound of catalyst on delivery; $3.125 per pound quarterly for the first two years; $2.75 per pound quarterly for the third year; and $2.50 per pound quarterly after three years. (*See* D.I. 278 at 5). In calculating Mobil's damages for Amoco's use of the infringing catalyst, the Court noted in its Opinion that "[i]t was stipulated that ... the number of pounds of catalyst used was 45,000 at Texas City No. 1, 55,600 at Texas City No. 2 and 105,000 at Decatur." (D.I. 278 at 98–99). The Court accepted the calculations of Amoco's Professor Myers with respect to the catalyst lease and found that Mobil was entitled to $16,259,542 before prejudgment interest for Amoco's manufacture and use of the AMSAC catalyst.

5. In the motion that is presently before the Court, Mobil requests the Court to alter or amend its judgment with respect to the damages awarded for Amoco's infringing use of the AMSAC catalyst. Mobil contends that Professor Myers' calculations with regard to damages due under the lease rates were incorrect in three respects. First, Mobil contends that, as the base for calculating the lease fee for Amoco's infringement, Professor Myers used the amount of MPVI catalyst that Amoco had used in its PX units before it began infringing. (D.I. 281 at 5). That is, Professor Myers' calculations rely on loadings of 105,000 pounds of catalyst at Amoco's Decatur plant, 45,000 pounds of catalyst at Amoco's Texas City No. 1 PX unit, and 55,600 pounds of catalyst at Amoco's Texas City No. 2 plant. According to Mobil, these numbers (which represent the pounds of MPVI catalyst that Amoco previously leased from Mobil) are not the appropriate royalty base under the Court's rulings; rather, the proper royalty base is the pounds of infringing AM-

SAC catalyst that were actually loaded into Amoco's PX units. (D.I. 281 at 5–6). According to Mobil, Amoco manufactured and used a total of 277,860 pounds of AMSAC catalyst, but Professor Myers' calculations only compensate Mobil for the use of 205,600 pounds of catalyst and, therefore, the Court's judgment does not compensate Mobil for 72,-260 pounds of infringing AMSAC catalyst. (D.I. 281 at 7).

6. Second, Plaintiff argues that Professor Myers' calculations do not apply the lease rates beginning with the dates Amoco loaded the infringing AMSAC catalysts into its PX units; instead, Professor Myers ran the numbers as a continuation of the payments that would have been due under Amoco's original lease of noninfringing MVPI catalyst based on the fiction that the AMSAC infringement never occurred, with the result that Amoco's payments under the tiered rate schedule were lowered. (D.I. 281 at 8). Mobil asserts that first, Professor Myers omitted the $3.00 per pound payment that is due within 30 days of installation of a catalyst load that is specified in all of the MPVI leases. (D.I. 281 at 8–9). Second, according to Mobil, Professor Myers' calculations of the lease fees for the early years of infringing use of AMSAC at each plant inappropriately used the lower rates of the tiered lease rate schedule applicable to later years of catalyst use. (D.I. 281 at 9). For example, Professor Myers calculated the MPVI lease rates for Amoco's infringement for the fourth quarter of 1980 as $288,750. Mobil asserts that in the fourth quarter of 1980, only the Decatur plant was operating with Amoco's infringing AMSAC catalyst. Yet, to calculate the damages in this fourth quarter of 1980, Professor Myers used a lease rate of $2.75 per pound of catalyst, which is the lease rate applicable in the third year of an MPVI lease. (D.I. 281 at 9–10). According to Mobil, because 1980 was the first year of Amoco's infringing use of AMSAC at its Decatur plant, the first year lease rate of $3.125 per pound should be used to calculate damages during the first year of infringing catalyst use.

7. Mobil's final argument in support of its Motion to Amend or Alter Judgment is that the present judgment is inconsistent. Mobil contends that, in calculating damages for Amoco's infringing PX production using the standard *license* rates, the Court appropriately did not count Amoco's non-infringing PX production into the tiered rate schedule. In exempting the non-infringing production, the Court properly concluded that, by infringing Mobil's process patents, Amoco had repudiated its right to have the infringing PX production counted in the tiered royalty schedule with the non-infringing production. (D.I. 281 at 15). The Court's conclusion in this regard resulted in Amoco's paying at the highest tier of the schedule of payments due under the license. Mobil contends that the same reasoning should be applied to the damages due under the composition of matter patent. That is, with regard to the damages due for Amoco's infringing manufacture and use of the AMSAC catalyst, the Court should find that when Amoco repudiated its MPVI lease and began infringing Mobil's catalyst patent, Amoco also repudiated its right to have its use of the noninfringing MVPI catalyst counted in the tiered lease rate schedule along with its use of infringing AMSAC catalyst.

8. In support of its present motion, Mobil relies upon Federal Rules of Civil Procedure Rule 60(b)(1) and 59(e). Rule 60(b)(1) states: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect".

9. The Court finds that Mobil has not demonstrated any "mistake" in the Court's judgment of September 29, 1994. Indeed, it appears to the Court that Mobil's proposed recalculations of damages are based upon figures and methods that were not presented at trial. It can hardly be said that the Court's failure to adopt calculations that were never presented amounts to a "mistake". To be sure, Mobil's own expert, Dr. Dugan, did not calculate Mobil's lost lease revenues based upon the AMSAC poundages actually used at Amoco's various plants under the standard lease schedule, nor did Dr. Dugan advance at trial the argument that the $3.00 per pound loading fee should

be calculated into the lost profits damages. Instead, Dr. Dugan, like Professor Myers, relied upon the stipulated amounts of MPVI catalyst to calculate lost lease revenues. Thus, Mobil cannot plausibly contend that the Court "mistakenly" did not adopt damage calculations that were not presented to it. In this regard, Mobil's argument that the AMSAC catalyst poundages are contained in documents that are found in the trial record is unavailing. The record contains many, many documents. Each party presented its damage theory at trial and relied upon the evidence it deemed necessary to prove its case. With regard to the lost profits theory, Mobil did not advocate at trial that the appropriate basis for calculating lost profits under the catalyst lease was the AMSAC poundages, nor did Mobil calculate the damages that would be due under the lease using these AMSAC poundages. Mobil concedes as much. *See* D.I. 281, Mobil's Memorandum in Support of its Motion to Alter or Amend the Judgment, at 1 (Mobil concedes that neither party calculated the lease fee that would accrue from application of the lease rates to Amoco's manufacture and use of the infringing AMSAC catalysts); D.I. 284 at 3 ("Neither party provided the correct calculation. Amoco did not and Mobil did not."). Thus, it is the opinion of this Court that any mistake that occurred was Mobil's mistake, not the Court's.

10. Having said that, the Court turns now to the second basis upon which Mobil's motion is premised, Rule 59(e). Federal Rule of Civil Procedure 59(e) provides: "A motion to alter or amend the judgment shall be served not later than 10 days after the entry of the judgment." There are three bases for granting a motion under Rule 59(e): 1) an intervening change in controlling law; 2) new evidence; or 3) a need to correct a clear error of law or prevent manifest injustice. *Dodge v. Susquehanna University,* 796 F.Supp. 829, 830 (M.D.Pa.1992). A Rule 59(e) motion is not to be used as a vehicle to advance additional arguments that a party could have made before judgment but neglected to do so. *Id.*

11. Mobil does not contend that there has been an intervening change in con-

trolling law or that there is any new evidence. Thus, the only possible basis for Mobil's Rule 59(e) motion is the need to prevent manifest injustice. In this regard, the Court has considered the evidence and, notwithstanding its finding that there has been no mistake, the Court finds that Mobil's motion must be granted to avoid manifest injustice.

12. In awarding Mobil damages for Amoco's infringement of the composition of matter patent, the Court adopted a lost profits analysis. The Court found that a "reasonable probability exists that but for Amoco's infringement, Mobil would have made all of Amoco's sales of the infringing catalyst." (D.I. 278 at 41). Accordingly, the Court found that a reasonable approximation of Mobil's lost profits is the lease payments Mobil would have received from Amoco. (D.I. 278 at 42). In light of the Court's finding that but for Amoco's infringement, Mobil would have made all of Amoco's sales of the infringing catalyst, the Court finds that the appropriate basis upon which to calculate Mobil's lost profits is the poundages of AMSAC catalyst that Amoco actually used, not the poundages of MVPI catalyst that would have been due under the lease if Amoco had not infringed. Accordingly, the Court finds that to avoid manifest injustice, the judgment must be amended to compensate Mobil for the additional 72,260 pounds of AMSAC catalyst. Furthermore, because the Court has found that the terms of Mobil's standard catalyst lease fee schedule must be applied to calculate Mobil's lost profits, the $3.00 per pound of catalyst installation fee must be calculated into the damages owed to Mobil. Notwithstanding the fact that Mobil neglected to introduce these calculations at trial, the Court finds that the prevention of manifest injustice necessitates amendment of the judgment in this regard. Finally, although Mobil's Dr. Dugan relied upon the same figures as Professor Myers to calculate lost profits, the Court finds that when Amoco repudiated its catalyst lease and began using the infringing AMSAC catalyst, it repudiated its right to have its noninfringing catalyst counted into the tiered lease rate schedule and, therefore, Amoco must compensate Mo-

bil as provided in the lease agreements starting as of the dates of catalyst installation. Again, the Court's ruling in this regard is based upon the need to prevent manifest injustice.[1]

NOW, THEREFORE, IT IS ORDERED that:

1. Plaintiff's Motion to Amend the Judgment is GRANTED. The Opinion of this Court dated September 29, 1994 is hereby amended to reflect the changes as herein ordered.

2. The parties shall stipulate to Plaintiff's damages as determined by the application of the full MPVI lease rate schedule to the amounts of infringing AMSAC catalyst actually manufactured, installed and used by Amoco during the period of infringement, in accordance with this Order.

See 70 F.3d 1258.

---

1. Even in the absence of a motion under either Rule 59(e) or Rule 60(b)(1), the Court has the inherent power to amend its judgment if it finds that an error has been made.